319 F.3d 1126
 Darcy TING, individually and on behalf of all others similarly situated; Consumer Action, a non profit membership organization, both as private attorneys general, Plaintiffs-Appellees,
v.
AT&T, a New York corporation, Defendant-Appellant.
 No. 02-15416.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 7, 2002.
 Filed February 11, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David W. Carpenter, Chicago, IL, for the defendant-appellant.
 F. Paul Bland, Jr., Washington, DC, James C. Sturdevant, Karen L. Hindin, The Sturdevant Law Firm P.C., San Francisco, California, for the plaintiffs-appellees.
 Michelle R. Van Glederen, Deputy Attorney General (California), Los Angeles, CA, for amicus curiae Attorney General of the State of California; V. Scott Bailey, Assistant Attorney General (Maryland), Baltimore, MD, for amici curiae States and Commonwealths of Maryland, Alaska, Arizona, Connecticut, Delaware, Florida, Illinois, Iowa, Louisiana, Maine, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Puerto Rico, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, and Wisconsin; Deborah M. Zuckerman, Washington, DC, for amicus curiae American Association of Retired Persons, all urging affirmance.
 Christopher R. Lipsett, Eric J. Mogilnicki, and Kirk D. Jensen, Wilmer, Cutler & Pickering, Washington, DC, for amici curiae American Financial Services Association and California Bankers Association, urging reversal.
 Appeal from the United States District Court for the Northern District of California; Bernard Zimmerman, Magistrate Judge, Presiding. D.C. No. CV-01-2969-BZ.
 Before: TASHIMA, THOMAS, and PAEZ, Circuit Judges.
 OPINION
 TASHIMA, Circuit Judge:
 
 
 1
 Darcy Ting, individually and on behalf of all others similarly situated, and Consumer Action, a non-profit membership organization, both as private attorneys general, brought suit against AT&T, alleging that AT&T's Consumer Services Agreement ("CSA") violates California's Consumer Legal Remedies Act and that state's Unfair Practices Act by barring customers from, among other things, pursuing claims against AT&T on a classwide basis. Finding the CSA unconscionable and in violation of California public policy, the district court[1] issued a permanent injunction against enforcement of sections 4 and 7 of the CSA. See Ting v. AT&T, 182 F.Supp.2d 902 (N.D.Cal.2002). AT&T appeals on the ground that the application of California's consumer protection laws is preempted by the Federal Communications Act and the Federal Arbitration Act. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.
 
 BACKGROUND
 
 2
 Congress enacted the Federal Communications Act ("Communications Act" or "1934 Act") in 1934. 48 Stat. 1064 (codified, as amended, at 47 U.S.C. § 151, et seq.). At the time, AT&T enjoyed a virtual monopoly over the nation's telephone service industry. The 1934 Act was intended to address the unique problems inherent in a monopolistic environment. It required telecommunications carriers to file with the Federal Communications Commission ("FCC" or "Commission") a list of tariffs, or "schedules," showing "all charges ... and ... the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). The Communications Act prohibited carriers from "extend[ing] to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified" in a carrier's filed tariffs. 47 U.S.C. § 203(c). "The goal of these provisions [was] to ensure that all purchasers of communications services receive[d] the same federally regulated rates." ICOM Holding, Inc. v. MCI Worldcom, Inc., 238 F.3d 219, 221 (2d Cir.2001) (citing MCI Telecomms. Corp. v. AT&T Corp., 512 U.S. 218, 229-30, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)).
 
 
 3
 To ensure that all service providers and their customers complied with the tariff, courts developed the "filed rate doctrine," which prohibited a regulated entity from charging rates for its services other than those specified in its duly filed tariff. AT&T v. Cent. Office Tel., Inc., 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). Under this rule, rates filed with the FCC bound both "carriers and [customers] with the force of law." Lowden v. Simonds-Shields Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939); Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1170 (9th Cir. 2002). The rights and liabilities defined by the tariff could not be "varied or enlarged by either contract or tort of the carrier." Cent. Office, 524 U.S. at 227, 118 S.Ct. 1956 (quoting Keogh v. Chicago & Nw. Ry., 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). Therefore, federal law preempted any state-law claim seeking to enforce a contractual provision that differed from a filed rate. ICOM Holding, 238 F.3d at 221.[2]
 
 
 4
 Because courts applying the filed rate doctrine presumed customers had knowledge of filed rates and, in turn, prohibited customers from relying on promises of any other charge, the filed rate doctrine, in practice, led to "quite unjust" results. Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 491 (2d Cir.1998); see also Maislin Indus., U.S., Inc., v. Primary Steel, Inc., 497 U.S. 116, 127, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). "`[T]his rule is undeniably strict and it obviously may work hardship in some cases' but ... [strict liability] `embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.'" Milne Truck Lines, Inc. v. Makita, Inc., 970 F.2d 564, 569 (9th Cir.1992) (quoting Louisville & Nashville R.R. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915)). Consequently, in applying the filed rate doctrine, courts universally precluded the application of equitable doctrines to vary the terms of the filed rate. See Cent. Office, 524 U.S. at 222, 118 S.Ct. 1956; Ill. Cent. Gulf R.R. v. Golden Triangle Wholesale Gas Co., 586 F.2d 588, 592 (5th Cir. 1978).
 
 
 5
 By the late 1970's, technological advances and increased competition had reduced the entry costs for AT&T's competitors in the telecommunications market, and some began to argue that the continuation of extensive tariff filing only imposed unnecessary costs on new entrants and facilitated collusive pricing. MCI, 512 U.S. at 220-21, 114 S.Ct. 2223. Starting in the early 1980's, the FCC tried to prohibit tariff-filing by non-dominant carriers (i.e., those other than AT&T) on the ground that "market forces and the administration of the complaint process" could guarantee reasonable rates without the lure of collusive pricing incentives inherent in the filed rate mechanism. Sixth Report and Order, Policy and Rules Concerning Rates for Competitive Common Carrier Services, 99 F.C.C.2d 1020, 1029 (1985). But the courts rejected "mandatory detariffing" as inconsistent with the terms of the Communications Act. See MCI Telecomms. Corp. v. FCC, 765 F.2d 1186, 1193 (D.C.Cir.1985) (holding that the Commission lacked statutory authority to prohibit the filing of tariffs). Then, in 1994, the Supreme Court held that because of the "enormous importance to the statutory scheme of the tariff-filing provision," the FCC's policy of "permissive detariffing" was not a valid "modification" under 47 U.S.C. § 203. MCI, 512 U.S. at 231, 114 S.Ct. 2223. As a result, following a 15 year effort to suspend the tariff-filing obligations for telecommunication carriers, the Commission was forced to wait for Congress to act.
 
 
 6
 The Telecommunications Act of 1996, Pub.L. No. 104-104, 100 Stat. 5, (codified as interspersed amendments to the Communications Act) ("1996 Act"), fundamentally altered the Communications Act's regulatory scheme. The 1996 Act effectively adopted the FCC's detariffing rationale. The purpose of the 1996 Act was "to provide for a pro-competitive, deregulatory national policy framework ... by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. (100 Stat. 5) 124. The 1996 Act directed the FCC to:
 
 
 7
 forbear from applying any regulation or any provision of this chapter if the Commission determines that —
 
 
 8
 (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;
 
 
 9
 (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and
 
 
 10
 (3) forbearance from applying such provision or regulation is consistent with the public interest.
 
 
 11
 47 U.S.C. § 160(a).
 
 
 12
 Finally armed with the requisite congressional authorization, the FCC promptly issued a Notice of Proposed Rulemaking on March 25, 1996, to "forbear from applying" the tariffing requirements of § 203 of the 1934 Act. Notice of Proposed Rulemaking, 11 F.C.C.R. 7,141 (1996). In the Notice, the Commission tentatively concluded that tariffs were no longer necessary because market forces were sufficient to protect consumers from unjust and unreasonable rates, terms, and conditions. Id. at ¶¶ 30, 31 (concluding that removing filing requirement will promote competition and prevent collusive pricing). Following a comment period, the FCC issued an order of mandatory detariffing on October 29, 1996, see Second Report and Order, 11 F.C.C.R. 20,730 (1996), thus confirming that "enforcement of the tariffing provision is neither necessary to ensure just and reasonable, non-discriminatory rates, nor necessary for the protection of consumers." MCI WorldCom, Inc., v. FCC, 209 F.3d 760, 763 (D.C.Cir.2000) (citing Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 21).
 
 
 13
 Under mandatory detariffing, rather than having carriers file their rates, terms, and conditions with the FCC, the Commission required telecommunications carriers to establish contracts with consumers governing the rates, terms, and conditions of interstate long distance service. Policy and Rules Concerning the International, Interexchange Marketplace, FCC Docket No. 01-93, at ¶ 9 (2001). On December 23, 1996, AT&T filed a petition for limited reconsideration and clarification with the FCC, requesting, among other things, that the Commission clarify that neither the effect nor intent of the detariffing order was to subject the rates, terms, and conditions of interstate telecommunications services to state law. Order on Reconsideration, 12 F.C.C.R. 15,014, at ¶ 76 (1997). AT&T's petition suggested that parties may misinterpret the Second Report and Order's statement that "consumers will also be able to pursue remedies under state consumer protection and contract laws," as permitting challenges under state law to the lawfulness of rates, terms, and conditions for interstate services. See id. Specifically, AT&T argued that any other interpretation of the detariffing order should be foreclosed by "numerous judicial decisions recognizing that §§ 201(b) and 202(a) of the Communications Act preempt state law with respect to the reasonableness of rates, terms, and conditions for interstate telecommunications services." See id.
 
 
 14
 The Commission's response to the petition has led to considerable confusion. The FCC stated that while the Communications Act "continues to govern determinations as to whether rates, terms, and conditions of interstate ... services are just and reasonable, and are not unjustly or unreasonably discriminatory ... the [Communications Act] does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment." Id. at ¶ 77. The Commission added: "As stated in the Second Report and Order, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime." Id.
 
 
 15
 AT&T began implementing its detariffing obligation in the summer of 2000. AT&T's CSA included a series of provisions designed to limit customers' rights and remedies in the event of a dispute with AT&T.[3] These provisions are contained in sections 4 and 7 of the CSA and are collectively known as the "Legal Remedies Provisions." Section 4 limits AT&T's liability for claims other than negligence to the amount of charges for service during the affected period and precludes liability for punitive, reliance, special, and consequential damages. Section 7(a) mandates binding arbitration and bans all class-wide dispute resolution.[4] The CSA also contains a secrecy provision for all arbitration proceedings and requires consumers to bring all claims within a two-year limitations period.
 
 
 16
 Before presenting the CSA to its customers, AT&T conducted extensive market research designed to predict how consumers would react to the CSA, which AT&T planned to mail with a cover letter and a set of frequently asked questions. AT&T's cover letter stated in bold text "[P]lease be assured that your AT&T service or billing will not change under the AT&T Consumer Services Agreement; there's nothing you need to do." AT&T's market study concluded that most customers "would stop reading and discard the letter" after reading this disclaimer. AT&T did not change the substance of the letter as a result of its market research — indeed, internal AT&T documents indicate that the letter was specifically intended to make customers less alert to the details of the CSA.
 
 
 17
 AT&T mailed the CSA in two separate mailings. To approximately 18 million of its residential, long-distance customers, AT&T included the materials in the envelope that contained the customer's monthly bill. No statement regarding the new agreement appeared on the outside of the envelope. To its remaining 42 million residential, long-distance customers, AT&T mailed the CSA and other materials in a separate envelope marked, "ATTENTION: Important information concerning your AT&T service enclosed." According to AT&T's research, only 25 percent of its customers were likely to open the separate mailing, approximately 10 percent would not even look at it, and only 30 percent would actually read the entire contract.
 
 
 18
 Sometime in July 2001, plaintiff Ting received, opened, and read the mailing from AT&T. Like most of AT&T's customers, she was not aware of AT&T's obligation under mandatory detariffing to forge contracts with its residential customers and was not expecting a contract from AT&T. The CSA and letter advised customers that by continuing to use or to pay for AT&T's service, the customer was accepting the terms of the CSA through the so-called "negative option". The second paragraph of the CSA itself provided that, in the event a customer did not wish to be bound by the CSA, the customer could call a toll-free number and cancel his or her AT&T service. The cover letter advised customers that the CSA described AT&T's "new binding arbitration process, which used an objective third party rather than a jury for resolving any disputes that may arise." The letter never mentioned the word "contract," but instead spoke of "providing information" to customers. Finally, the CSA did not include a provision informing customers that federal law would govern its relationship with AT&T, but instead included an express New York state law choice-of-law provision.
 
 
 19
 Plaintiffs Ting and Consumer Action brought a state-court class action against AT&T for declaratory and injunctive relief, alleging that the Legal Remedies Provisions violate California's consumer protection and contract laws. AT&T argued that it had satisfied California's contract-formation requirements as required in the Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 77, and that in any event, plaintiffs' substantive challenges to the lawfulness of the CSA were preempted by the Communications Act. After concluding that the Legal Remedies Provisions violated California's public policy and unconscionability law, the district court concluded that neither § 201(b) nor § 202(a) of the 1934 Act preempted state law in the detariffed environment because Congress removed the filing requirement with the intention of ending the preemptive regime of the filed rate doctrine. See Ting, 182 F.Supp.2d at 927-38.
 
 STANDARDS OF REVIEW
 
 20
 We review for abuse of discretion the district court's grant of a permanent injunction, but review any determination underlying the grant of an injunction by the standard that applies to that determination. LaVine v. Blaine Sch. Dist., 257 F.3d 981, 987 (9th Cir.2001), cert. denied, ___ U.S. ___, 122 S.Ct. 2663, 153 L.Ed.2d 837 (2002). Accordingly, we review the district court's factual findings under the clearly erroneous standard. Berkla v. Corel Corp., 290 F.3d 983, 990 (9th Cir.2002), amended by 302 F.3d 909 (9th Cir.2002). The district court's conclusion that the CSA was unconscionable raises a question of law subject to de novo review. Am. Bankers Mortgage Corp. v. Fed. Home Loan Mortgage Corp., 75 F.3d 1401, 1412 (9th Cir.1996); Arcwel Marine, Inc. v. Southwest Marine, Inc., 816 F.2d 468, 470 (9th Cir.1987). We review de novo the district court's preemption analysis. AGG Enters. v. Wash. County, 281 F.3d 1324, 1327 (9th Cir.2002).
 
 DISCUSSION
 I. Preemption
 
 21
 AT&T contends that §§ 201(b) and 202(a) of the Communications Act contain a principle against preferential and discriminatory rates, which preempts the application of state contract and consumer protection laws prohibiting the terms contained in the Legal Remedies Provisions. One circuit court recently agreed with this novel argument. In Boomer v. AT&T Corp., 309 F.3d 404 (7th Cir.2002), the Seventh Circuit held that, "read together," §§ 201(b) and 202(a) preempt state law challenges to the validity of AT&T's arbitration clause banning class-action lawsuits. Id. at 418. The court reasoned that permitting state law challenges to the CSA's arbitration provision would violate the Communication Act's principle of uniform rates and could threaten AT&T's ability to offer its customers the lowest possible price in violation of § 202(a)'s principle against "preferences" and "unreasonable discrimination." Id. at 419-20.
 
 
 22
 Because we do not believe that state contract and consumer protection laws obstruct Congress' "chosen means" for effectuating the purposes of §§ 201(b) and 202(a) in a detariffed environment, we respectfully disagree with the Boomer court's conclusion. Examining "the provisions of the whole law, and ... its object and policy," Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)), we reject AT&T's argument as contrary to both the text and structure of the 1934 Act and the clear intent of Congress in enacting the 1996 Act.
 
 A. Preemption Doctrine
 
 23
 Pursuant to the Supremacy Clause, U.S. CONST., ART. VI, cl. 2, federal law can preempt and displace state law through: (1) express preemption; (2) field preemption (sometimes referred to as complete preemption); and (3) conflict preemption. See Pac. Gas & Elec. Co. v. Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); Int'l Paper Co. v. Ouellette, 479 U.S. 481, 491, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Express preemption exists where Congress enacts an explicit statutory command that state law be displaced.[5] See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 382, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Absent explicit preemptive text, we may still infer preemption based on field or conflict preemption, both of which require us to imply Congress' intent from the statute's structure and purpose. See Sprietsma v. Mercury Marine, ___ U.S. ___, ___, 123 S.Ct. 518, 527, 154 L.Ed.2d 466 (2002); FMC Corp. v. Holliday, 498 U.S. 52, 56-57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990).
 
 
 24
 Field preemption exists "`where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.'" Petitioning Creditors v. Matsco, Inc. (In re Cybernetic Servs., Inc.), 252 F.3d 1039, 1045-46 (9th Cir.2001) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Even when Congress has not occupied the field, we may still infer preemption if there is an "actual conflict" between federal and state law. Conflict preemption is found where "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Geier v. Am. Honda Motor Co., 529 U.S. 861, 899, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)).
 
 
 25
 When considering preemption, no matter which type, "[t]he purpose of Congress is the ultimate touchstone." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Where the statute does not speak directly to the issue, we look to "the goals and policies of the Act in determining whether it in fact preempts an action." Ouellette, 479 U.S. at 493, 107 S.Ct. 805. As explained in Gade, "[o]ur ultimate task in any preemption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." 505 U.S. at 98, 112 S.Ct. 2374; Cal. v. Fed. Energy Regulatory Comm'n, 495 U.S. 490, 504, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990). Ordinarily, we also apply a presumption against preemption. However, "when the State regulates in an area where there has been a history of significant federal presence," United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000), the presumption usually does not apply, id.; Bank of Am. v. City & County of San Francisco, 309 F.3d 551, 558 (9th Cir. 2002). Thus, we do not apply the presumption against preemption in this case because of the long history of federal presence in regulating long-distance telecommunications.
 
 
 26
 Sections 201(b) and 202(a) do not contain preemptive text, so express preemption is not an issue here. Likewise, field preemption is not an issue because state law unquestionably plays a role in the regulation of long-distance contracts. See Boomer, 309 F.3d at 424 (rejecting AT&T's field preemption argument, overruling in part Cahnmann, 133 F.3d at 489-90, which previously held that the Communications Act completely preempted state law, and stating that "following detariffing there appears to be some role for state law"); Marcus v. AT&T Corp., 138 F.3d 46, 54 (2d Cir.1998) (holding that the Communications Act does not "manifest a clear Congressional intent to preempt state law actions prohibiting deceptive business practices, false advertising, or common-law fraud"). Indeed, even AT&T concedes that state law now governs the formation of consumer long-distance contracts. See Boomer, 309 F.3d at 424 (citing 12 F.C.C.R. 15,014, at ¶ 77). Detariffing has created a much larger role for state law and this fact is sufficient to preclude a finding that Congress intended completely to occupy the field, following the 1996 Act. We therefore focus exclusively on AT&T's claim of implied conflict preemption.
 
 B. Implied Conflict Preemption
 
 27
 AT&T contends that the district court's order requires AT&T to "prefer" California customers at the expense of its customers in the remaining 49 states. AT&T argues that, as a result, it has been exposed to liability from unhappy non-Californians, some of whom may charge AT&T with unlawfully and unreasonably preferring the "locality" of California in violation of 47 U.S.C. § 202(a). In other words, AT&T claims that it has been placed between the proverbial rock and a hard place, forced to prefer California law, and that state law must give if Congress' objectives in passing §§ 201(b) and 202(a) are to be realized. We disagree.
 
 
 28
 Section 201(b) of the Communications Act provides:
 
 
 29
 All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful.
 
 
 30
 47 U.S.C. § 201(b). Section 202(a) of the Communications Act provides:
 
 
 31
 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
 
 
 32
 47 U.S.C. § 202(a). After examining the structure, history, and purpose of these provisions, as well as the statute as a whole, Gade, 505 U.S. at 98, 112 S.Ct. 2374; Ouellette, 479 U.S. at 493, 107 S.Ct. 805, we hold that neither the Consumer Legal Remedies Act ("CLRA") nor California's unconscionability law "stands as an obstacle to the accomplishment and execution" of the full purposes and objectives of Congress in enacting §§ 201(b) and 202(a) of the Communications Act.
 
 
 33
 Under the obstruction strand of conflict preemption, an aberrant or hostile state rule is preempted to the extent it actually interferes with the "methods by which the federal statute was designed to reach [its] goal." Ouellette, 479 U.S. at 494, 107 S.Ct. 805; see Gade, 505 U.S. at 103, 112 S.Ct. 2374; Verizon North, Inc. v. Strand, 309 F.3d 935, 940 (6th Cir.2002). In making this determination, we "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." Jones v. Rath Packing Co., 430 U.S. 519, 526, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Time Warner Entm't Co., v. FCC, 56 F.3d 151, 195 (D.C.Cir.1995) ("[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract.") (quoting Alascom, Inc. v. FCC, 727 F.2d 1212, 1220 (D.C.Cir.1984)). Thus, obstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation.
 
 
 34
 In this case, AT&T claims that the purpose of §§ 201(b) and 202(a) is to ensure national uniformity of carrier rates, terms, and conditions, and that Congress' chosen method of effectuating this purpose is through unilateral policing by the FCC. Following detariffing, we find both arguments unpersuasive. We first examine the purpose of §§ 201(b) and 202(a) and then discuss Congress' chosen method to effectuate the statutes' objectives in the detariffed environment.
 
 Purpose
 
 35
 AT&T contends that, if California customers need not pay for the benefit of bringing class actions, then the imposition of California's CLRA and unconscionability law frustrates the Communication Act's principle of uniformity by affording Californians a discount off the national rate. Thus, AT&T interprets §§ 201(b) and 202(a) as forbidding carriers from offering its customers anything but precisely the same terms, rates, and conditions nationwide. Because California's public policy prohibits the Legal Remedies Provisions, AT&T concludes that customers from other states are being discriminated against, contrary to Congress' object in passing §§ 201(b) and 202(a). We disagree. AT&T's argument conflates Congress' purpose in enacting § 202(a) and Congress' separate purpose in passing § 203.[6]
 
 
 36
 Sections 201(b) and 202(a) unquestionably evince a congressional intent that customers receive fair and reasonable rates from telecommunications carriers. See 47 U.S.C. § 202(a) (making it unlawful for a carrier to "make any unjust or unreasonable discrimination" for "like communication service," or "to make or give any undue or unreasonable preference of advantage"). However, nearly 70 years of case law plainly demonstrates that the principle of uniformity is not derived from § 202(a) alone, but from the mandate to publish rates together with the discrimination principles reflected in §§ 201(b) and 202(a). See, e.g., Cent. Office, 524 U.S. at 223, 118 S.Ct. 1956; MCI, 512 U.S. at 230, 114 S.Ct. 2223 (stating that the filing requirement "`render[s] rates definite and certain, and ... prevent[s] discrimination and other abuses'") (quoting Ariz. Grocery Co. v. Atchison, Topeka, & Santa Fe Ry., 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348 (1932)); Brown, 277 F.3d at 1170 ("The filed-rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff.") (quoting Cent. Office, 524 U.S. at 230-31, 118 S.Ct. 1956 (Rehnquist, C.J., concurring)).
 
 
 37
 Moreover, save for Boomer, no court has ever referred to § 201 or § 202 in declaring a carrier's tariff immune from state-law challenge. That role had always been reserved for § 203 and the filed rate doctrine. See Cent. Office, 524 U.S. at 223, 118 S.Ct. 1956 ("[T]he filed rate doctrine... is necessary to `prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts,' the very evil the filing requirement seeks to prevent.") (emphasis added) (quoting Maislin, 497 U.S. at 127, 110 S.Ct. 2759); id. at 222, 110 S.Ct. 2759 ("[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff."); id. ("The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier."); ICOM Holding, 238 F.3d at 222-23 (holding that filed-rate doctrine barred state-law breach of contract claims); County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858, 866 (9th Cir. 1997) ("[T]he filed rate doctrine bars all claims — state and federal — that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed.").
 
 
 38
 Now that the FCC no longer enforces § 203's filing requirement, the old statutory scheme — which is the foundation of AT&T's argument — fails to support AT&T's argument. AT&T's argument that § 202(a) satisfies both its own anti-discrimination function as well as § 203's preemption function is untenable. Congress structured the 1934 Act in autonomous parts — each piece having its own purpose and serving a distinct function. Indeed, Supreme Court cases "express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); see also Gade, 505 U.S. at 100, 112 S.Ct. 2374 ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted); Adams v. Apfel, 149 F.3d 844, 846 (8th Cir.1998) (stating that all provisions of a statute must be construed together to give each an independent meaning). We thus reject AT&T's interpretation of § 202, which would "render[] superfluous" § 203 of the 1934 Act. Because §§ 201(b) and 202(a) survived detariffing, the substantive principles of reasonableness and nondiscrimination remain intact. But the same cannot be said of the principle of preemption, which was a product of the filed rate doctrine which, by definition, did not survive detariffing.[7]
 
 
 39
 To establish that § 202(a) contains an independent statement of uniformity, AT&T relies on Central Office, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222, as well as several cases arising under the Interstate Commerce Act, on which the 1934 Act was modeled. See, e.g., Davis v. Cornwell, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848 (1924); W. Union Tel. Co. v. Esteve Bros. & Co., 256 U.S. 566, 41 S.Ct. 584, 65 L.Ed. 1094 (1921); Chicago & Alton R.R. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912); Tex. & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). In all of these cases, however, the regulatory scheme at issue included some form of a federal tariff filing requirement, even though the requirement at times was voluntary. By contrast, the current environment is completely detariffed and highly competitive. AT&T's heavy reliance on Central Office is similarly misplaced. That case focuses narrowly on the issue of the preemptive scope of the filed-tariff doctrine. 524 U.S. at 216, 118 S.Ct. 1956 ("The issue before us is whether the federal filed-tariff requirements of the Communications Act preempt respondent's state-law claims."). It provides no support for AT&T's argument that after detariffing state contract and consumer protection laws restricting AT&T's ability to impose the terms of its CSA on its consumers are preempted.
 
 
 40
 Finally, courts have never interpreted § 202(a) as mandating strict uniformity. Even prior to detariffing, courts emphasized that the provision did not prohibit all preferences, but only those that were "unjust or unreasonable." See 47 U.S.C. § 202(a). Therefore, if the application of different state contract and consumer protection laws resulted in different treatment of customers, such differences between states violated § 202(a) only if they resulted in unjust and unreasonable discrimination or preferences. In Panatronic USA v. AT&T Corp., 287 F.3d 840 (9th Cir.2002), for example, we recently addressed § 202(a)'s test for reasonableness within the tariffed framework.[8] We held that failing to assess universal connectivity charges on some customers while assessing it on others was not unreasonable discrimination in pricing under § 202(a), because "[a] difference in price is not unreasonable if there is a `neutral, rational basis underlying[the disparity].'"[9] Id. at 844 (quoting Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1133 (D.C.Cir.1984)) (second brackets in the original); see also MCI Telecomms. Corp. v. FCC, 917 F.2d 30, 41 (D.C.Cir. 1990).
 
 
 41
 Accordingly, even when courts interpreted § 202(a) in the tariffed framework, contractual differences between customers of different states violated § 202(a) only if those differences lack a neutral and rational basis. See also MCI, 917 F.2d at 41 ("In order to adjudge whether price discrimination is reasonable under Section 202(a), the FCC must compare the charges actually assessed under the two pricing schemes and the `terms' of each arrangement. It may declare the disparate charges lawful only if there is a neutral, rational basis underlying [the disparity].") (internal quotations omitted). This interpretation, adopted in the Ninth and D.C. Circuits, directly contradicts AT&T's interpretation that § 202(a), whether applied within or without the tariffed framework, precludes variations in carrier terms, rates, and conditions.
 
 
 42
 These arguments notwithstanding, the court in Boomer reasoned that the principle of strict uniformity survived detariffing because, in authorizing the FCC to forgo the tariff filing requirement, Congress directed the FCC to establish first that the filing of tariffs was "not necessary to ensure that the charges, practices, classifications, or regulations ... are just and reasonable and are not unjustly or unreasonably discriminatory." 309 F.3d at 421 (citing 47 U.S.C. § 160(a)(1)). The court reasoned that even though the FCC no longer mandates the filing of tariffs, "the congressional objective of providing uniform rates, terms and conditions remains, as does the federal prohibition on terms and conditions which are unjust or unreasonable." Id. at 421-22. Likewise, AT&T claims that the text of §§ 201(b) and 202(a), and particularly § 202(a)'s language regarding unreasonable "preference," provide enough textual support independently to preempt state law. See 47 U.S.C. § 202(a). A finding of obstruction, however, depends on more than a mere identification of favorable text. Indeed, we recognize that § 202(a) evinces a congressional intent that customers receive non-preferential treatment. But, in order to determine whether Congress' goals are truly being frustrated, the obstruction inquiry examines congressional purpose, as well as the method chosen by Congress to effectuate that purpose. See Ouellette, 479 U.S. at 494, 107 S.Ct. 805; Gade, 505 U.S. at 103, 112 S.Ct. 2374. It is this second element that Congress altered in the 1996 Act.
 
 C. Method
 
 43
 Prior to detariffing, "rate filing was Congress' chosen means of preventing unreasonableness in discrimination in charges." MCI, 512 U.S. at 230, 114 S.Ct. 2223. Following detariffing, AT&T argues that rate filing was only a "procedural mechanism" for achieving §§ 201(b) and 202(a)'s substantive goals, and therefore the removal of that mechanism did not modify the Communication Act's preemptive regime. We disagree for two reasons. First, although a procedural device, the filing requirement constituted the "heart of the common-carrier section of the Communications Act." MCI, 512 U.S. at 229, 114 S.Ct. 2223. We thus reject AT&T's casual assertion that the regulatory scheme has been only slightly affected by detariffing. To the contrary, it has been substantially altered. Second, although AT&T concludes correctly that Congress now believes that the goals of §§ 201 and 202 can be met without the filing mechanism, AT&T fails to recognize that Congress' fundamental purpose in enacting the 1996 Act was to replace the old monopoly-based regime with one based on market competition. Thus, when Congress authorized the FCC to eliminate the filing requirement, it chose to replace the rate filing mechanism with a market-based mechanism. Unlike rate filing, this market-based method depends in part on state law for the protection of consumers in the deregulated and competitive marketplace. This dependence creates a complimentary role between federal and state law under the 1996 Act.
 
 
 44
 Relying on Western Union Telegraph, AT&T contends that tariff filings were merely "procedural features" of the 1934 Act and that the preemptive effect of the Act truly "flowed" from § 202(a). 256 U.S. at 573, 41 S.Ct. 584. Much as congressional intent is the "touchstone" of preemption analysis, however, "[t]he requirements of § 203 that common carriers file their rates with the Commission and charge only the filed rate were the centerpiece of the Act's regulatory scheme." MCI, 512 U.S. at 220, 114 S.Ct. 2223; see also Fax Telecommunicaciones, 138 F.3d at 488 ("The filed rate doctrine ... is the central principle of the regulatory scheme for interstate telecommunications carriers."). When presented with the prospect of detariffing, and its potential effect on the structure and purpose of the 1934 Act, the Supreme Court commented that
 
 
 45
 [l]oss of an entire toenail is insignificant; loss of an entire arm tragic. The tariff-filing requirement is, to pursue this analogy, the heart of the common-carrier section of the Communications Act. In the context of the Interstate Commerce Act, which served as its model, this Court has repeatedly stressed that rate filing was Congress's chosen means of preventing unreasonableness in discrimination in charges .... The duty to file rates with the Commission, ... and the obligation to charge only those rates, have always been considered essential to preventing price discrimination and stabilizing rates.
 
 
 46
 MCI, 512 U.S. at 229-30, 114 S.Ct. 2223 (quoting in part Maislin, 497 U.S. at 126, 110 S.Ct. 2759). The Court went on to explain that "[m]uch of the rest of the Communications Act subchapter applicable to Common Carriers ... are premised upon the tariff-filing requirement of § 203," including § 201 and § 202. Id. at 230, 114 S.Ct. 2223. Critically, the Court opined that if the filing requirement were removed, "[t]he provisions allowing customers and competitors to challenge rates as unreasonable or as discriminatory, would not be susceptible of effective enforcement," because "rate filings are, in fact, the essential characteristics of a rate-regulated industry."[10] Id. at 230-31, 114 S.Ct. 2223 (citing 47 U.S.C. §§ 204, 206, 207, 406).
 
 
 47
 Thus, in authorizing the FCC to forbear from enforcing the tariff filing requirement, Congress not only removed its "chosen means" of enforcing §§ 201 and 202, it removed the "heart" of the 1934 Act. Pursuant to the Court's interpretation of the regulatory scheme in MCI, unless Congress replaced the filing requirement with an alternative means of enforcement, the regulatory scheme is not "susceptible of effective enforcement" following detariffing. 512 U.S. at 230-31, 114 S.Ct. 2223. Both AT&T and the court in Boomer fail to recognize that §§ 201 and 202 contain substantive standards that are enforceable only if they have an enforcement vehicle, such as the filing requirement. Prior to detariffing, the filing requirement forbade carriers from "demand[ing] ... a greater or less or different compensation ... than the charges specified in the schedule then in effect." 47 U.S.C. § 203(c). Under this scheme, a carrier was prohibited from varying its published contract terms. See Cent. Office, 524 U.S. at 223, 118 S.Ct. 1956; Brown, 277 F.3d at 1170 ("A carrier is forbidden from charging rates other than as set out in its filed tariff."). Congress' new market-based method contains no such restriction. The market not only encourages carriers to remain flexible, it protects consumers through state contract and consumer protection laws, and ensures reasonable rates through competition rather than rate filing. On balance, the market-based approach calls for §§ 201 and 202 to be interpreted in light of market conditions.
 
 
 48
 Moreover, AT&T's argument that Congress intended to maintain the status quo after the 1996 Act must fail. The preemptive effect of the filed rate doctrine, as its name plainly implies, rested entirely on the filing requirement. There is nothing in the 1996 Act to suggest that Congress replaced the filing requirement with another preemptive provision. While the principle of reasonableness insured that all filed rates were fair before they actually preempted state law, AT&T's argument that the reasonableness requirement independently preempts state law is unpersuasive, given both the primacy of the filing requirement in preempting state law under the old regime and the complete absence of any support for the proposition that § 202(a) independently preempts state law absent the filing requirement. The FCC, moreover, recognized the void left by the abandonment of the filed rate doctrine when it stated expressly that "in the absence of ... tariffs ... consumers will not only have our complaint process, but will also be able to pursue remedies under state consumer protection and contract laws." Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 42; see also id. at ¶ 5.
 
 
 49
 Under the old regime, state law interfered with Congress' chosen method of rate filing in that, pursuant to the filed rate doctrine, the tariff could not be "varied or enlarged by either contract or tort of the carrier." Cent. Office, 524 U.S. at 227, 118 S.Ct. 1956 (quoting Keogh, 260 U.S. at 163, 43 S.Ct. 47); MCI, 512 U.S. at 230, 114 S.Ct. 2223. Federal law therefore preempted state law. But under the competition-based regime adopted by Congress in 1996, and implemented by the FCC, state law protections are no longer excluded as they once were under the express terms of the filed rate doctrine. In the post-tariff environment, we find no reason to imply a conflict between otherwise complimentary state and federal laws. In deregulated markets, compliance with state law is the norm rather than the exception. Congress recognized as much in authorizing forbearance authority and in emphasizing competition in the 1996 Act.
 
 
 50
 Congress envisioned the 1996 Act as a dramatic break with the past that would revolutionize long distance service by greatly decreasing the scope of the FCC's role. The Senate floor manager, Senator Larry Pressler, stated that "[t]his is the most comprehensive deregulation of the telecommunications industry in history." CONG. REC. S8188-04, S8197 (daily ed. June 12, 1995).[11] To this end, the purpose of the 1996 Act is to "provide for a pro-competitive, deregulatory national policy framework ... by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. (100 Stat. 5) 124; see City of Auburn v. Qwest Corp., 260 F.3d 1160, 1170 n. 5 (9th Cir.2001). Section 160(a) of the 1996 Act also provides that "[i]f the Commission determines that ... forbearance will promote competition... that determination may be the basis for a ... finding that forbearance is in the public interest." 47 U.S.C. § 160(b); see also Verizon Communications, Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646, 1668 n. 20, 152 L.Ed.2d 701 (2002) ("[T]he Act was `deregulatory,' in the intended sense of departing from traditional `regulatory' ways that coddled monopolies[.]").
 
 
 51
 Congress was well aware of the FCC's long struggle to detariff and its rationale for wanting to do so when it passed the 1996 Act. Throughout this struggle, the FCC continually stressed that filing was unnecessary because increased competition in the long-distance marketplace, rather than rate-filing, could guarantee reasonable and fair treatment of customers. In its Notice of Proposed Rule Making, the FCC summarized its long-held position: "The economic underpinning of our proposal to streamline the regulatory procedures for non-dominant carriers flows from the fact that firms lacking market power simply cannot rationally price their services in ways which, or impose terms and conditions which, contravene Sections 201(b) and 202(a) of the Act." 11 F.C.C.R. 7,141, at ¶ 28. As early as 1980, the FCC had proposed a system in which §§ 201 and 202 would be enforced not through rate filings but market-based competition. See First Report and Order, 85 F.C.C.2d 1, at ¶ 16 (1980) ("[T]hese carriers generally lack the market power to charge rates or impose conditions of service that would contravene the Act.").[12] The FCC emphasized this rationale for the next 15 years. In 1996, Congress finally amended the Communications Act to grant the FCC the authority needed to detariff.
 
 
 52
 The FCC's detariffing orders provide further confirmation that Congress intended to replace the filing mechanism with a market-based mechanism that expressly encompassed state law. In numerous passages, the FCC makes clear that the availability of state law remedies in the newly-detariffed telecommunications marketplace is an essential part of protection for consumers. Responding to an argument that consumers would not be adequately protected in a detariffed environment, the FCC stated that consumers will "not only have our complaint process, but will also be able to pursue remedies under state consumer protection and contract laws." Order on Reconsideration, 12 F.C.C.R. 15,014, at ¶ 42. The FCC added: "[W]hen interstate ... services are completely detariffed, consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against abusive practices." Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 5 (emphasis added). The Commission concluded that "a regime without nondominant interexchange carrier tariffs for interstate, domestic, interexchange service is the most pro-competitive, deregulatory system." Id. at ¶ 52 (emphasis added). It added that "parties that oppose complete detariffing have not shown that the business of providing interstate, domestic, interexchange services offered by nondominant interexchange carriers should be subject to a regulatory regime that is not available to firms that compete in any other market in this country." Id. at ¶ 138.
 
 
 53
 AT&T emphasizes the FCC's response to AT&T's petition for clarification, in which the FCC stated that it would continue to govern the reasonableness of carrier-customer contracts in the detariffed environment. See 12 F.C.C.R. 15,014, at ¶ 77 (1997). Contrary to AT&T's assertions, the FCC's clarification is entirely consistent with Congress' chosen method of enforcing § 201 and § 202's substantive standards. As noted above, the obstruction inquiry examines the "relationship between state and federal laws as they are interpreted and applied, not merely as they are written." Jones, 430 U.S. at 526, 97 S.Ct. 1305. The FCC recently applied § 202(a) in the detariffed environment, and adopted the market-based mechanism for enforcing the fairness standard. See Orloff v. Vodafone Airtouch Licenses, 17 F.C.C.R. 8987 (2002). The case demonstrates that while the FCC continues to "govern" § 201 and § 202, state law is no longer excluded as it was under the filed rate doctrine, because Congress's market-based mechanism permits — indeed, depends upon — the imposition of state law. It is just that under detariffing, § 201 and § 202 are now interpreted in light of a market environment.
 
 
 54
 In Orloff, the FCC held that a telecommunications carrier may grant preferences to customers consistent with § 202(a), provided the relevant market is competitive enough that no single provider dominates the market. The FCC applied the same three-part test as in Panatronic, and held that Vodafone's practice of meeting competitors' inducements (but not making them available for existing customers) did not amount to unreasonable or unjust discrimination in violation of § 202(a) of the 1934 Act because market forces protect the customer in the detariffed environment. Id. at 8996-97. The FCC concluded that:
 
 
 55
 Given the indisputable competition in the Cleveland CMRS market, we decline to find that Defendants' concessions practices violated section 202(a) of the Act, even if those practices allowed some consumers to negotiate better deals than other consumers. This is because we find that market forces protect Cleveland consumers from discrimination from these particular practices. We find that there is no evidence that any market failure prevented customers from switching carriers if they were dissatisfied.
 
 
 56
 Id. Thus, in contrast to 1934, when Congress enacted §§ 201(b) and 202(a) to protect customers for whom AT&T was the only option, the FCC now defers to the market unless the market is seriously flawed or not competitive. In so doing, the FCC has imported the rationale behind detariffing (namely, that competition can guarantee reasonable rates) into the law of § 202(a). See Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 21 ("[W]e believe that market forces will generally ensure that the rates, practices, and classifications of nondominant interexchange carriers for interstate, domestic, interexchange services are just and reasonable and not unjustly or unreasonably discriminatory.").
 
 
 57
 Of course, in the case of interstate services and the application of state law, a customer cannot avoid the "preference" afforded California customers. Therefore, an unsatisfied customer cannot "switch" from AT&T to another provider to seek redress. The dispositive question, however, is not whether the customer can go elsewhere, but whether the market in question is competitive enough to dissuade carriers from discriminating or overcharging. In assessing any particular market, moreover, the imposition of state law is not generally considered an "imperfection" or "failure," and we decline to characterize it as one here. By definition, the deregulated marketplace encompasses state laws of general applicability. Here, California's unconscionability law is not unlike that of most other states, and even if it were, it does not make an otherwise competitive market non-competitive. The same can be said of the CLRA. State contract and consumer protection laws, including California's CLRA and unconscionability law, form part of the competitive framework to which the FCC defers.
 
 
 58
 The FCC's hands-off approach conforms to the FCC's rationale for detariffing and to Congress' rationale for granting the FCC authorization to forbear from detariffing. During the course of implementing the 1996 Act, the FCC stated on a number of occasions that one of the major purposes of detariffing was to eliminate the filed rate doctrine and its harmful effects on customers. See Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 55; Order on Reconsideration, 12 F.C.C.R. 15,014, at ¶¶ 12, 13, 80; Second Order on Reconsideration, 14 F.C.C.R. 6004, at ¶ 17 (1999). Prior to detariffing, the federal tariff structure provided the framework for the carrier-customer relationship. See MCI, 512 U.S. at 229-30, 114 S.Ct. 2223. After detariffing, federal telecommunications regulation is silent with respect to how to determine the rights and obligations of parties to individual contracts like the CSA.
 
 
 59
 Although the FCC understood how to apply and interpret tariffs, this expertise has little application in the review and interpretation of each carrier's "short, standard contract[]." 11 F.C.C.R. 20,730, at ¶ 57. More to the point, there is no federal common law of contracts that the FCC can apply in resolving private contract disputes between long distance carriers and their customers. In O'Melveny & Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the Court noted that federal common law is "limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." Id. at 87, 114 S.Ct. 2048 (internal quotations omitted) (stating that federal common law displaces state law only in "few and restricted" areas). With the advent of detariffing, the conflict between state and federal law no longer exists and thus application of federal common law is inappropriate. See also Northwest Airlines, Inc. v. Transp. Workers Union, 451 U.S. 77, 95, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (stating that courts must be cautious in fashioning federal common law because "the federal lawmaking power is vested in the legislative, not the judicial, branch of government"). AT&T fails to address this critical point. In the absence of significant conflict between federal policy and the use of state law, we hold that state contract and consumer protection laws form part of the framework for determining the rights, obligations, and remedies of the parties to the CSA.
 
 
 60
 In both Panatronic and Orloff, the court and Commission interpreted and applied § 202(a) to permit the "execution of the full purposes and objectives of Congress," Hines, 312 U.S. at 67, 61 S.Ct. 399, while at the same time leaving ample room for state law. In Panatronic, we interpreted § 202's reasonableness requirement as permitting neutral and rational differences, 287 F.3d at 844, whereas in Orloff, the FCC applied § 202(a) to permit preferential treatment so long as the market was competitive, 17 F.C.C.R. at 8996-97. Notwithstanding AT&T's pre-detariffing interpretation of the 1934 Act, neither Panatronic nor Orloff applies § 202 in a manner that excludes state law or obstructs Congress' objectives in passing the 1996 Act. In short, whereas Congress previously required tariffs to ensure strict uniformity with §§ 201 and 202's standards, Congress now relies on competition to ensure a more market-oriented (and less collusive) level of compliance with §§ 201 and 202. We therefore conclude that neither the CLRA nor California's unconscionability law conflicts with § 201(b) or § 202(a), because neither law interferes with Congress' chosen method in effectuating the purposes of the federal law.
 
 D. Factual Findings
 
 61
 Finally, we emphasize that this case comes to us after trial, with extensive factual findings by the district court. The district court found that although AT&T suggested that its costs would be lower if it could impose the Legal Remedies Provisions on its customers, AT&T actually presented no evidence that the Legal Remedies Provisions would, in fact, produce lower charges. Ting, 182 F.Supp.2d at 931 n. 16. The court also refused to assume that lower costs necessarily result in lower charges, "since while lower costs can produce lower charges, they can also produce higher profits." Id. We review these findings under the clearly erroneous standard. Berkla, 290 F.3d at 990.
 
 
 62
 AT&T asks us to assume that long-distance telecommunications carriers automatically pass on savings from litigation costs to its customers rather than maintaining them as higher profits. Yet AT&T presents no evidence that class-action lawsuits actually increase AT&T's litigation costs, and if so, by just how much. Furthermore, the FCC has concluded that "requiring nondominant interexchange carriers to conduct their businesses as do other businesses in an unregulated market will not substantially increase their costs." Order on Reconsideration, 12 F.C.C.R. 15,014, at ¶ 15. In Boomer, the Seventh Circuit considered the same question absent a factual record, and held, in the abstract, that a state law challenge to "an arbitration clause (or for that matter a provision prohibiting class actions) not only affects uniformity of that term, but it also threatens to destroy the consistency of rates offered consumers throughout the United States." 309 F.3d at 419. Because the case at bench contains specific findings of fact, finding that the CSA's arbitration provisions did not in fact affect AT&T's costs, we need not reach the abstract question of whether an arbitration provision banning class actions per se lowers costs. Applying clear error review, we affirm the district court's finding that the Legal Remedies Provisions do not constitute an "unreasonable discrimination in charge" affecting AT&T's rates, terms, or conditions. For this reason, even assuming arguendo that §§ 201(b) and 202(a) have preemptive effect, AT&T fails to establish that the Legal Remedies Provisions fall within § 202(a)'s alleged preemptive scope.
 
 II. California Law
 
 63
 We next consider AT&T's claim that even if federal law does not preempt Ting's state law challenges, California law does not render the Legal Remedies Provisions unenforceable. The district court enjoined sections 4 and 7 of the CSA on two grounds. First, the district court held that the CSA's two-year limitations period for bringing claims, as well as the bar on class actions, were unenforceable under the anti-waiver provisions of the CLRA. Next, the district court concluded that four aspects of sections 4 and 7 of the CSA were procedurally and substantively unconscionable.
 
 A. Consumer Legal Remedies Act
 
 64
 Section 1751 of the CLRA renders "unenforceable and void" any waiver by a consumer of the statutory rights provided for under the CLRA, Am. Online, Inc. v. Superior Court, 90 Cal.App.4th 1, 108 Cal.Rptr.2d 699, 707 (2001), and sections 1781(a) and 1783 permit consumers to bring class actions within a three-year limitations period. Cal. Civ.Code §§ 1751, 1781(a), 1783. Because the CSA bars class-action lawsuits and imposes a two-year limitations period, the CSA violates the express terms of the CLRA. In response, AT&T contends that the Federal Arbitration Act ("FAA") preempts the application of the CLRA. The district court did not reach this issue, but, on this issue of law, we agree with AT&T.
 
 
 65
 The FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). With the enactment of the FAA, "Congress precluded states from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed `upon the same footing as other contracts.'" Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). Under § 2, however, state law is not entirely displaced from federal arbitration analysis. In Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931 (9th Cir.2001), we stated that "as long as state law defenses concerning the validity, revocability, and enforceability of contracts are generally applied to all contracts, and not limited to arbitration clauses, federal courts may enforce them under the FAA." Id. at 937 (emphasis added); see also Perry v. Thomas, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) ("[S]tate law ... is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (emphasis in the original).
 
 
 66
 The CLRA applies to any contract "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770(a). Section 1761(d) defines "consumer" to mean "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ.Code § 1761(d). Accordingly, the CLRA does not apply to commercial or government contracts, or to contracts formed by nonprofit organizations and other non-commercial groups. See Cal. Grocers Ass'n v. Bank of Am., 22 Cal.App.4th 205, 27 Cal.Rptr.2d 396, 404 (1994) (holding that trade group is not "consumer" of services for personal, family, or household purposes as defined within CLRA). The CLRA is also inapplicable to rental agreements. Lazar v. Hertz Corp., 143 Cal.App.3d 128, 191 Cal.Rptr. 849, 858 (1983) (stating that customer who rented automobile is not "consumer" covered by CLRA).
 
 
 67
 Because the CLRA applies to such a limited set of transactions, we conclude that it is not a law of "general applicability." Cf. Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (preempting anti-waiver provision that rendered "void" the waiver of "any provision of[California Franchise Investment Law]"); Bradley v. Harris Research, Inc., 275 F.3d 884, 890 (9th Cir.2001) (preempting California law that "applies only to forum selection clauses and only to franchise agreements"). Similar to the limited nature of the statute in Bradley, the CLRA applies only to noncommercial contracts and only to consumer contracts. For this reason, we reverse the district court's holding that section 1751 of the CLRA renders void the CSA's class action ban and two-year limitations period.
 
 B. Unconscionability
 
 68
 In California, a contract or clause is unenforceable if it is both procedurally and substantively unconscionable. See Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal.4th 83, 99 Cal. Rptr.2d 745, 6 P.3d 669, 690 (2000); Circuit City v. Adams, 279 F.3d 889, 893 (9th Cir.2002) (citing Stirlen v. Supercuts, Inc., 51 Cal.App.4th 1519, 60 Cal.Rptr.2d 138, 145 (1997)). Pursuant to Armendariz, courts apply a sliding scale: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." 99 Cal.Rptr.2d 745, 6 P.3d at 690; Soltani v. W. & S. Life Ins. Co., 258 F.3d 1038, 1042 (9th Cir.2001).
 
 1. Procedural Unconscionability
 
 69
 A contract is procedurally unconscionable if it is a contract of adhesion, i.e., a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it. Armendariz, 99 Cal.Rptr.2d 745, 6 P.3d at 690 (citing Neal v. State Farm Ins. Co., 188 Cal.App.2d 690, 10 Cal.Rptr. 781 (1961)); see also Circuit City, 279 F.3d at 893; Flores v. Transamerica HomeFirst, Inc., 93 Cal.App.4th 846, 113 Cal. Rptr.2d 376, 382 (2001) ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability."). In finding the CSA procedurally unconscionable, the district court emphasized that, after drafting the agreement, AT&T imposed the CSA on its customers without opportunity for negotiation, modification, or waiver. We agree. AT&T mailed the CSA in an envelope that few customers realized contained a contract, and offered its terms on a take-it-or-leave-it basis. Cf. Flores, 93 Cal.App.4th at 853-54 (holding that generic arbitration clauses contained in loan agreement and deed of trust constituted a contract of adhesion because offered without opportunity for negotiation).
 
 
 70
 AT&T responds that the district court ignored the fact that the third largest carrier, Verizon, had no arbitration agreement in their contract and that consumers therefore had the option of rejecting AT&T's CSA and switching to a competitor. Even if this is the case, and even assuming such alternatives matter under California law, see Armendariz, 99 Cal. Rptr.2d 745, 6 P.3d at 691 (rejecting contention that availability of alternative sources of supply affects the procedural unconscionability analysis), it nonetheless fails to overcome the district court's well-founded conclusion that the CSA is a procedurally unconscionable contract. See Szetela v. Discover Bank, 97 Cal.App.4th 1094, 118 Cal.Rptr.2d 862, 867 (2002) ("Szetela received the amendment to the Cardholder Agreement in a bill stuffer.... His only option, if he did not wish to accept the amendment, was to close his account. [This] establishes the necessary element of procedural unconscionability."). Indeed, if customers complained about the arbitration provision, AT&T responded with a letter informing them that "all other major long distance carriers have included an arbitration provision in their services agreement." Consequently, if consumers had meaningful choices, AT&T intentionally dissuaded its own customers from seeking them. See Flores, 93 Cal.App.4th at 853 (finding procedural unconscionability in part because "HomeFirst's representative told plaintiffs that HomeFirst was the only company in California offering reverse mortgages, thereby indicating that plaintiffs had no real choice of alternate lenders").
 
 2. Substantive Unconscionability
 
 71
 Substantive unconscionability focuses on the one-sidedness of the contract terms. Armendariz, 99 Cal.Rptr.2d 745, 6 P.3d at 690; Flores, 93 Cal.App.4th at 854. Where an arbitration agreement is concerned, the agreement is unconscionable unless the arbitration remedy contains a "modicum of bilaterality." Armendariz, 99 Cal.Rptr.2d 745, 6 P.3d at 692. "Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope ... the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself." Id. In determining whether an arbitration agreement is sufficiently bilateral, courts assessing California law look beyond facial neutrality and examine the actual effects of the challenged provision. See Acorn v. Household Int'l, Inc., 211 F.Supp.2d 1160, 1172 (N.D.Cal.2002); Szetela, 118 Cal. Rptr.2d at 868.
 
 
 72
 The district court declared unconscionable four aspects of the CSA: (1) the bar on class actions, (2) the arbitration fee scheme, (3) the secrecy provision, and (4) the limitation on willful misconduct.[13]
 
 a. Class Action Provision
 
 73
 In Szetela, 97 Cal.App.4th 1094, 118 Cal.Rptr.2d 862, the California Court of Appeal recently considered the conscionability of a class action ban in a contract of adhesion. Id. at 867. The court stated that "[a]lthough styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact [defendant] Discover [Card], because credit card companies typically do not sue their customers in class-action lawsuits." Id. Given the actual effects of the provision, the court found the class action ban "manifest[ly] one-sided[]" and therefore substantively unconscionable. Id.
 
 
 74
 The district court below adopted similar reasoning, as have most other courts to consider the issue. See Luna v. Household Fin. Corp. III, 2002 WL 31487425, *9 (W.D.Wash. Nov.4, 2002); Acorn, 211 F.Supp.2d at 1172; Mandel v. Household Bank, 105 Cal.App.4th 75, 129 Cal.Rptr.2d 380, 2003 WL 57282, at *4 (2003) (applying Nevada law); Mercuro v. Superior Court, 96 Cal.App.4th 167, 116 Cal.Rptr.2d 671, 678 (2002) (arbitration forum, though equally applicable to both parties, relevant to finding of unconscionability because "repeat player effect" rendered provision disadvantageous to weaker party).[14] It is not only difficult to imagine AT&T bringing a class action against its own customers, but AT&T fails to allege that it has ever or would ever do so. Instead, it raises a number of alternative challenges to the district court's holding. However, because "bilaterality" is a requirement in all California arbitration agreements, see Armendariz, 6 P.3d at 692; Circuit City, 279 F.3d at 893, we affirm the district court's conclusion that the class-action ban violates California's unconscionability law.[15]
 
 b. Fee-Splitting Scheme
 
 75
 The CSA requires customers to split the arbitrator's fees with AT&T. In enjoining the provision as unconscionable, the district found that while the majority of complainants would be handled satisfactorily either by customer service representatives or subsidized arbitration, some complainants would hypothetically face prohibitive arbitration costs, effectively deterring them from vindicating their statutory rights.
 
 
 76
 In Circuit City, 279 F.3d 889, we recently applied California law in declaring a similar fee-splitting scheme unenforceable. Id. at 894. That case is indistinguishable from the one at bench. Here, the scheme is unconscionable because it imposes on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court. See Armendariz, 99 Cal.Rptr.2d 745, 6 P.3d at 687 ("[T]he arbitration process cannot generally require the employee to bear any type of expenses that the employee would not be required to bear if he or she were free to bring the action in court.") (emphasis in original). A number of other courts have arrived at the same conclusion. See Shankle v. B-G Maint., Inc., 163 F.3d 1230, 1235 (10th Cir.1999) (holding unenforceable a fee-splitting provision that would cost an employee between $1,875 and $5,000 to resolve a particular claim); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1485 (D.C.Cir.1997) (upholding a fee-splitting agreement, but only after the court construed the agreement to require the employer to pay all the arbitrator's fees). Consistent with our decision in Circuit City, we affirm the district court's conclusion that the CSA's fee splitting scheme is unconscionable.
 
 
 77
 Our decision is also consistent with the FAA. AT&T contends that the district court "singled out" arbitration agreements for special treatment by declaring the provision unconscionable simply because it would require customers to share some of the costs. However, parties that agree to arbitrate statutory claims still are entitled to basic procedural and remedial protections so that they can effectively realize their statutory rights. Circuit City, 279 F.3d at 895 (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)); Cole, 105 F.3d at 1482. Among these protections is the assurance that an individual need not "pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." Cole, 105 F.3d at 1482 (emphasis in the original) (listing five basic requirements that arbitration forum must meet). Additionally, because unconscionability is a defense to contracts generally and does not single out arbitration agreements for special scrutiny, it may be raised consistent with § 2 of the FAA. Doctor's Assocs., 517 U.S. at 688, 116 S.Ct. 1652.
 
 
 78
 c. Confidentiality Provision
 
 
 79
 The CSA's confidentiality provision requires "[a]ny arbitration [to] remain confidential."[16] Although facially neutral, confidentiality provisions usually favor companies over individuals. In Cole, 105 F.3d 1465, the D.C. Circuit recognized that because companies continually arbitrate the same claims, the arbitration process tends to favor the company. Id. at 1476. Yet because of plaintiffs' lawyers and arbitration appointing agencies like the AAA, who can scrutinize arbitration awards and accumulate a body of knowledge on a particular company, the court discounted the likelihood of any harm occurring from the "repeat player" effect. Id. at 1486. We conclude, however, that if the company succeeds in imposing a gag order, plaintiffs are unable to mitigate the advantages inherent in being a repeat player. This is particularly harmful here, because the contract at issue affects seven million Californians. Thus, AT&T has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, AT&T accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. Further, the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination against AT&T. For these reasons, we hold that the district court did not err in finding the secrecy provision unconscionable.
 
 C. FAA Arbitration Preemption
 
 80
 AT&T argues that the district court applied California's unconscionability law in a manner "inherently hostile" to arbitration. See Perry, 482 U.S. at 492 n. 9, 107 S.Ct. 2520; cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (rejecting legal analysis that "rested on suspicion of arbitration as a method of weakening the protections afforded in the substantive law"). We disagree.
 
 
 81
 If the district court indicated any hostility, it was not directed at arbitration, but at the manner in which it was forced upon consumers, the way in which AT&T avoided liability for willful misconduct, and the costs to consumers of vindicating their rights. The decision is hostile to the adhesive and oppressive nature of the CSA, not to the particular forum. See, e.g., Circuit City, 279 F.3d at 891-92 (holding unconscionable similar arbitration agreement that required employees to submit all claims and disputes to binding arbitration). More importantly, the Supreme Court's generalized statements on arbitration do not override the FAA's particular rule, which obtains here and which is well-settled: "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." See Doctor's Assocs., 517 U.S. at 687, 116 S.Ct. 1652.
 
 CONCLUSION
 
 82
 In sum, we affirm the district court's conclusion that the Legal Remedies Provisions are unenforceable as unconscionable under California law, the application of which is not preempted by §§ 201(b) and 202(a) of the Federal Communications Act. The FAA preempts the CLRA's anti-waiver provision. We therefore reverse the district court's conclusion that the CLRA renders void the CSA's class action ban and two-year limitations period. Because the district court did not find the two-year limitations period unconscionable, this aspect of the CSA is revived. The other provisions remain unenforceable as originally drafted. We, of course, do not rule on the legality of any changes to the CSA since the district court's decision. Costs on appeal are awarded to appellees.
 
 
 83
 AFFIRMED in part and REVERSED in part.
 
 
 
 Notes:
 
 
 [1]
 The parties consented to the jurisdiction of a magistrate judge over all proceedings, including the entry of judgment, pursuant to 28 U.S.C. § 636(c)(1)
 
 
 [2]
 See also Cahnmann v. Sprint Corp., 133 F.3d 484, 489 (7th Cir.1998) ("[S]ince the federal regulation defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce."), overruled in part by Boomer v. AT&T Corp., 309 F.3d 404, 424 (7th Cir.2002) ("[U]nder the new detariffed regime federal law no longer completely preempts state law.").
 
 
 [3]
 The district court discussed extensively AT&T's litigation experience prior to the drafting of the CSA. The court noted that, in recent years, AT&T and its competitors had faced a number of costly class action lawsuitsSee Ting, 182 F.Supp.2d at 918.
 
 
 [4]
 Section 7, captioned "Dispute Resolution," sets forth procedures for resolving customer disputes. In approximately eight-point font (replicated below), section 7(a) provides in part:
 THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU CONTINUE TO HAVE CERTAIN RIGHTS TO OBTAIN RELIEF FROM A FEDERAL OR STATE REGULATORY AGENCY.
 NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON, OR RESOLVED ON A CLASS WIDE BASIS. THE ARBITRATOR MAY NOT AWARD DAMAGES THAT ARE NOT EXPRESSLY AUTHORIZED BY THIS AGREEMENT AND MAY NOT AWARD PUNITIVE DAMAGES OR ATTORNEYS' FEES UNLESS SUCH DAMAGES ARE EXPRESSLY AUTHORIZED BY A STATUTE. YOU AND AT&T BOTH WAIVE ANY CLAIMS FOR AN AWARD OF DAMAGES THAT ARE EXCLUDED UNDER THIS AGREEMENT.
 
 
 [5]
 For example, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a), provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."
 
 
 [6]
 Section 203(a) provides in relevant part:
 Every common carrier ... shall ... file with the Commission and print and keep open for public inspection schedules showing all charges ... and showing the classifications, practices, and regulations affecting such charges. Such schedules shall ... be posted and kept open for public inspection... each such schedule shall give notice of its effective date ....
 47 U.S.C. § 203(a). In relevant part, § 203(c) provides:
 [N]o carrier shall ... charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such [tariff] schedule than the charges specified in the schedule then in effect.
 47 U.S.C. § 203(c).
 
 
 [7]
 See Notice of Proposed Rule Making, 11 F.C.C.R. 7,141, at ¶ 31 ("In addition, the absence of tariffs would eliminate possible invocation by carriers of the filed rate doctrine."); Second Report and Order, 11 F.C.C.R. 20,730, at ¶ 38 ("Moreover, we note that in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the `filed-rate' doctrine.").
 
 
 [8]
 The cases cited by AT&T also demonstrate the recurring theme that courts have never interpreted § 202(a) as a preemptive provision. Rather,Panatronic indicates that courts treat § 202(a) as a consumer protection provision that is designed to remedy unreasonable price disparities. Save for Boomer, no court has ever interpreted §§ 201(b) or 202(a) independently to preempt state law. See, e.g., Law Offices of Curtis V. Trinko v. Bell Atlantic Corp., 305 F.3d 89, 98-99 (2d Cir.2002); Eagleview Tech. v. MDS Assocs., 190 F.3d 1195, 1197 (11th Cir.1999); Am. Message Ctr. v. FCC, 50 F.3d 35, 40 (D.C.Cir.1995); Competitive Telecommunications Ass'n v. FCC, 998 F.2d 1058, 1061 (D.C.Cir.1993); Reservation Tel. Coop. v. FCC, 826 F.2d 1129, 1136 (D.C.Cir.1987); Ad Hoc Telecommunications Users Comm. v. FCC, 680 F.2d 790, 795 (D.C.Cir.1982).
 
 
 [9]
 Courts have fashioned a three-step analysis to determine whether a carrier has violated § 202(a). First, we ask whether the services are "like." If they are, we ask whether there is a price difference between them, and if so, whether the difference is reasonableNat'l Communications Ass'n, Inc. v. AT&T Corp., 238 F.3d 124, 127 (2d Cir.2001); Am. Message Ctr., 50 F.3d at 40. Plaintiff must establish the first two elements. The burden shifts to the carrier to justify the price disparity as reasonable. Nat'l Communications Ass'n, 238 F.3d at 129-133.
 
 
 [10]
 In a footnote, the court explained that while eliminating the tariff filing requirement would frustrate the FCC's ability to enforce the Act through the complaint process, it would not compromise Congress' underlying purpose in passing the 1934 ActMCI, 512 U.S. at 231 n. 4, 114 S.Ct. 2223.
 
 
 [11]
 See also Sen. Pressler, 141CONG. REC. S7942-04, S7967(daily ed. June 8, 1995) ("This bill is much more deregulatory than any we have had before us .... [I]t will be a great step toward deregulation and a pro-market competition."); Rep. Oxley, 141 CONG. REC. H8281-02, H2826 (daily ed. Aug. 2, 1995) ("Make no mistake about it. This is the most deregulatory bill in American history.... It opens up all telecommunications markets to full competition ...."); Sen. Gorton, 141 CONG. REC. S8206-02, S8212 (daily ed. June 13, 1995) (stating that the Act would allow "States to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers, which are, of course, the precise goals of this Federal statute itself").
 
 
 [12]
 See also Sixth Report and Order, 99 F.C.C.2d 1020, at ¶ 12 ("We have previously stated that non-dominant carriers have insufficient market power to engage in activities that Congress sought to prevent.").
 
 
 [13]
 AT&T subsequently amended the CSA to eliminate the language limiting its liability for willful misconduct. AT&T also re-wrote the confidentiality provision. On appeal, AT&T challenges the district court's judgment enjoining the provisions on the sole ground that the court erred in not rewriting the provisions. Yet the district court reasonably concluded that because the Legal Remedies Provisions were so "permeated with unconscionability and illegality," they could not as a whole be saved or reformed. The court did not abuse its discretion in so concluding
 
 
 [14]
 To the extentArriaga v. Cross Country Bank, 163 F.Supp.2d 1189 (S.D.Cal.2001), is inconsistent with the conclusion reached in Szetela, Acorn, and Mercuro, we reject it as inconsistent with Armendariz. Arriaga held that a class action ban was not "one-sided" because, unlike in Armendariz, neither side technically had recourse to the courts. Id. at 1195. This conclusion ignores the obvious practical implications of the arbitration provision. As noted in Szetela, there is no chance that any large company like AT&T would file a class action against its consumers. 118 Cal.Rptr.2d at 867-68. That the company may do so is not dispositive. To hold otherwise ignores the question that underlies the substantive unconscionability analysis, namely, whether the agreement is unduly one-sided. See Circuit City, 279 F.3d at 893.
 
 
 [15]
 We disagree with the California Court of Appeal's recent analysis inDiscover Bank v. Superior Court, 105 Cal.App.4th 326, 129 Cal. Rptr.2d 393, 2003 WL 116143 (2003). Because unconscionability is a generally applicable contract defense, it may be applied to invalidate an arbitration agreement without contravening § 2 of the FAA. See Doctor's Assocs., 517 U.S. at 687, 116 S.Ct. 1652. We recognize, as does the court in Discover Bank, that the FAA preempts state laws of limited applicability, including the CLRA, but we follow well-settled Supreme Court precedent in rejecting the proposition that unconscionability is one of those laws. See id. at 686-87 (stating that the Act "declares that state law may be applied if that law arose to govern issues concerning validity, revocability, and enforceability of contracts generally," and holding that "generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA) (emphasis added).
 
 
 [16]
 AT&T subsequently re-wrote the confidentiality provision. Initially, the confidentiality provision stated: "Any arbitration shall remain confidential. Neither you nor AT&T may disclose the existence, content or results of any arbitration or award, except as may be required by law or to confirm and enforce an award."