AMERICAN MESSAGE CENTERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Sprint Communications Company, L.P., Intervenor.

No. 93–1549.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1994.

Decided March 28, 1995.

As Amended March 28, 1995.

Rehearing Denied June 7, 1995.

Russell D. Lukas, Washington, DC, argued the cause and filed the briefs, for petitioner.

Laurel R. Bergold, Atty., F.C.C., Washington, DC, argued the cause, for respondents. With her on the briefs were Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle and William E. Kennard, Attys., F.C.C., Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan, Atty., U.S. Dept. of Justice, Washington, DC. James M. Carr and Renee Licht, Attys., F.C.C., and Marion L. Jetton, Atty., U.S. Dept. of Justice, Washington, DC, entered appearances, for respondents.

Michael B. Fingerhut and Leon M. Kestenbaum, Washington, DC, were on the brief, for intervenor. Richard E. Wiley and Ray M. Senkowski, Washington, DC, entered appearances, for intervenor.

Before: SILBERMAN, HENDERSON, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

American Message Centers (AMC), a consumer of long distance telecommunications services, petitions for review of the Federal Communications Commission's order denying its complaint against intervenor Sprint Communications Company concerning Sprint's refusal to forgive charges arising from fraudulent calls made by computer hackers. Because the Commission's determination that Sprint's tariffs clearly and explicitly require its customers to pay for all completed calls is not arbitrary or capricious, and because AMC's complaint failed to identify any instance in which Sprint excused similar toll fraud charges for other customers, we deny the petition for review.

## I.

AMC provides answering services to retailers in California and Nevada, allowing the retailers' customers, regardless of their location, to reach a customer service center with a local phone call. All calls to a retailer's local customer service number are automatically forwarded over an incoming WATS line to AMC's central office in Sherman Oaks, California, so that AMC rather than the customer pays the toll charges for the call. To answer and direct these incoming calls, AMC installed equipment at its Sherman Oaks office which instructed callers with touchtone phones to enter a certain key indicating the nature of and destination for their call: the ubiquitous "press 1 for new accounts; press 2 for billing inquiries;" etc. Instead of purchasing long distance services from one of the major carriers, AMC obtained them from a "reseller," Telecom Management Systems (TMS). TMS purchased blocks of long distance service on a volume discount basis from the major carriers, including Sprint, and "resold" them to secondary customers like AMC, passing on a portion of the discount.

In early 1991, Sprint notified AMC of two unusually long calls on its incoming WATS line. AMC passed this information along to TMS, which investigated the matter and discovered the "remote access toll fraud" at the center of this dispute. Hackers in New York City somehow had obtained the access code for AMC's outgoing lines. Instead of pressing a "1" or a "2" when they reached the recorded message asking the nature of their calls, the hackers entered the access code, received a dial tone, and were then able to make long distance calls to other locations. Both the initial call, which came in to Sherman Oaks on AMC's WATS line, and the outgoing long distance calls were charged to AMC. AMC immediately disconnected the equipment, but the hackers had already placed approximately $160,000 in fraudulent calls.

Neither AMC, TMS, nor Sprint was eager to absorb the $160,000 loss. AMC took the position that because it had not authorized the calls, it would not pay TMS. When Sprint informed TMS that it intended to hold TMS responsible for the entire $160,000 in charges, TMS notified AMC that it expected AMC to pay in full. After several weeks of fruitless discussions, TMS sued AMC in state court to collect the unpaid balance. AMC then asked Sprint to meet with it and TMS to discuss the problem. Sprint, which had no contractual relationship with AMC, refused, explaining that any arrangement between TMS and its customer was "not the business of Sprint." Because Sprint refused to talk to AMC, AMC asked TMS to dispute the charges with Sprint in writing. TMS refused.

Against this background, AMC filed a formal complaint with the Federal Communications Commission charging both TMS and Sprint with violating the Communications Act of 1934, 47 U.S.C. §§ 151–613 (1988 & Supp. V 1993). AMC claimed that Sprint's tariffs did not authorize it to charge consumers for unauthorized calls, and that its attempt to collect such charges from TMS was "unjust and unreasonable" in violation of section 201(b) of the Act. AMC also alleged that Sprint had forgiven toll fraud charges for other customers and that its refusal to do the same for TMS amounted to unreasonable discrimination in violation of section 202(a). As to TMS, AMC claimed that TMS had promised to monitor AMC's usage and to take immediate corrective action if problems arose, and that with this promise TMS assumed liability for any remote access toll fraud. In addition, AMC contended that by the terms of the TMS service agreement it was liable only for services it actually used.

Shortly after filing its complaint with the Commission, AMC settled with TMS. For reasons that remain unclear to us given AMC's characterization of its service agreement with TMS, AMC paid TMS $80,000—half of the disputed amount—and moved to dismiss its FCC charges against TMS. In return, TMS accepted the payment as full satisfaction of the unpaid balance. AMC then amended its complaint against Sprint to include a claim for the $80,000 it paid TMS. TMS later declared bankruptcy.

The Commission ruled that Sprint's tariffs permitted the company to charge its customers for all services provided under the tariffs, including unauthorized toll calls. Requiring

TMS to pay the charges associated with the toll fraud, therefore, was neither unjust nor unreasonable under section 201(b). On the section 202(a) discrimination charge, the Commission determined that AMC's complaint did not allege facts sufficient to establish a claim. *American Message Centers,* 8 F.C.C. R. 5522 (1993). This petition for review followed.

In its petition, AMC renews its argument that Sprint's treatment of TMS violates sections 201(b) and 202(a), and argues for the first time that Sprint negligently failed to warn its customers of the risks of toll fraud. AMC also contends that the Commission failed to address its arguments that Sprint's conduct was "anti-competitive" and that it is unjust and unreasonable for Sprint to make a profit on fraudulent calls. Finally, AMC protests the Commission's rulings denying its motions to compel discovery and to impose sanctions on Sprint.

## II.

We review the Commission's decision and rulings under section 706 of the Administrative Procedure Act. In order to prevail, the petitioner must demonstrate that the Commission's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). Where, as here, the issue is the Commission's interpretation of a tariff, we defer to its reading if it is "reasonable [and] based upon factors within the Commission's expertise." *Diamond Int'l Corp. v. FCC,* 627 F.2d 489, 492 (D.C.Cir. 1980). We will reverse only if "the [Commission's] decision is not supported by substantial evidence, or the [Commission] has made a clear error in judgment." *Kisser v. Cisneros,* 14 F.3d 615, 619 (D.C.Cir.1994).

We begin with AMC's charge that Sprint's actions were unreasonable and unjust under section 201, which provides that all "charges, practices, classifications, and regulations" related to communication services must be "just and reasonable." 47 U.S.C. § 201(b) (1988). FCC rules require that a carrier's published tariffs contain "clear and explicit explanatory statements" regarding rates and regulations, 47 C.F.R.

§ 61.2 (1994), and that the tariffs "clearly and definitely" specify any "exceptions or conditions which in any way affect the rates named in the tariff." 47 C.F.R. § 61.54(j) (1994).

The Sprint tariffs governing the long distance services at issue state that the "subscriber shall be responsible for the payment of all charges for service provided under this Tariff." *American Message Centers,* 8 F.C.C. R. at 5523 (quoting U.S. Sprint, F.C.C. Tariff Nos. 1 & 2, section 3.11.4). The Commission rejected AMC's contention that this language is vague and ambiguous, ruling that since the tariff contains no exceptions to this "general payment obligation," "the clear meaning of the relevant tariff provisions is that the subscriber's obligation includes liability for unauthorized usage of services provided under the tariff." 8 F.C.C. R. at 5524.

The Commission's reasoning is neither arbitrary nor capricious. On its face, Sprint's tariff establishes a general obligation to pay "all charges for service provided." This is "clear" and "definite." If Sprint "provides" the service—in other words, if the call goes through—the customer has to pay for the call. According to AMC, only a tariff stating that subscribers are responsible for all charges, including charges for toll fraud, would be sufficiently clear and definite to allow a carrier to charge consumers for unauthorized calls. The Commission rejected this argument, as it has in other cases, *see, e.g., Chartways Technologies,* 8 F.C.C. R. 5601 (1993), and nothing in the statute or the Commission's rules compels it to adopt such a rigid requirement. While carriers must identify any exceptions or conditions affecting their tariffs, charging subscribers for unauthorized but completed calls is not an exception or condition to Sprint's general payment obligation. Instead, it falls under the general rule that the customer pays for all completed calls. *See id.* at 5603.

Pointing to the "Liability of the Carrier" section of Sprint's tariff, which states that "the carrier is not liable for any damages, including toll charges, the subscriber may incur as a result of the unauthorized use of

its telephone facilities," U.S. Sprint, F.C.C. Tariff No. 1, section 3.4.5, Joint Appendix at 71, AMC argues that the Commission should have required Sprint to use equally explicit language to define its subscribers' liability for unauthorized calls in the general payment obligation provisions. The language cited by AMC, however, hardly undermines the Commission's finding. Indeed, the most natural reading of the liability provision, together with the general payment obligation provision in section 3.11.4 of the tariff, is that the subscriber, not Sprint, is liable for any charges arising from unauthorized use of the customer's lines. We agree with the Commission that Sprint did not violate section 201(b).

### III.

■ We next address AMC's claim that Sprint's treatment of TMS violated section 202(a), which prohibits "any unjust or unreasonable discrimination in charges, practices, . . . or services for or in connection with like communication service, directly or indirectly, by any means or device." 47 U.S.C. § 202(a) (1988). We have described the inquiry into whether a carrier is discriminating in violation of section 202(a) as involving three steps: (1) whether the services are "like"; (2) if so, whether the carrier is offering the service to other customers at a "different" price or under "different" conditions than those offered to the petitioner; and (3) if such a difference exists, whether that difference is unreasonable. See *Competitive Telecommunications Ass'n v. FCC,* 998 F.2d 1058, 1061 (D.C.Cir.1993).

In rejecting AMC's section 202(a) claim, the Commission focused on the third step of this inquiry, reasoning that even assuming Sprint had forgiven toll fraud charges for other customers, the complaint did not allege facts sufficient to prove that this difference in treatment was unreasonable. Critical to the Commission's reasoning was AMC's unqualified assertion in its complaint that TMS refused its specific request to dispute the charges with Sprint. According to the Commission, Sprint did not act unreasonably by seeking full payment from a customer that

did not challenge its bill. *American Message Centers,* 8 F.C.C. R. at 5524.

AMC challenges the Commission's finding that TMS never contested the charges with Sprint, arguing in effect that the Commission erred by accepting AMC's own representations. We need not resolve that question, for even if we ignore AMC's own assertion and assume for purposes of argument that TMS did dispute the charges, the complaint still does not satisfy the second step of the *Competitive Telecommunications* inquiry because AMC failed to identify any specific instance in which Sprint treated another customer in like circumstances differently than it treated AMC.

The closest AMC comes to making a specific allegation of discrimination is in paragraph 37 of its complaint, which alleges that

US Sprint's refusal to discuss the Telecom/AMC dispute is grossly inconsistent with its treatment of other customers in similar circumstances. In the first quarter of 1987, US Sprint credited $19 million to subscribers who were victims of toll fraud for the amount billed as a result of such abuse.

Complaint ¶ 37 n. 39. In support of this assertion, AMC cites an exhibit submitted by another petitioner in a different FCC proceeding. Yet that exhibit merely states, without any supporting documentation, that "In the [first quarter] of 1987, U.S. Sprint took $19 [million] off its books to compensate for phone fraud." *See* Petition for Declaratory Ruling of Pacific Mutual Life Ins. Co., F.C.C. File No. ENF–91–07 at exhibit 8 (filed Jan. 30, 1991). This is not enough to sustain a discrimination claim. We cannot tell, for example, whether Sprint actually "forgave" this $19 million in charges, as AMC alleges, or instead was forced to take the charge against earnings because its customers refused to make full payment.

■■ AMC argues that it needed discovery to uncover specific instances of discrimination and that the Commission arbitrarily refused to compel Sprint to respond to interrogatories intended for this purpose. The Commission did not abuse its discretion in this matter. As the Commission explained when it promulgated the rules governing pro-

ceedings under the Communications Act, "[f]ormal complaint proceedings, unlike court litigation or administrative-trial type hearings, are often resolved solely on the written pleadings. These pleadings must therefore stand on their own and provide the factual underpinnings for a decision on the merits." *Amendment of Rules Governing Procedures to be Followed Where Formal Complaints are Filed Against Common Carriers,* 3 F.C.C. R. 1806, 1806 ¶ 8. Accordingly, the Commission's fact-pleading rules require a petitioner to plead "[a]ll matters concerning a claim ... fully and with specificity," 47 C.F.R. § 1.720(a) (1994), by providing a "[c]omplete identification or description, including relevant time period, of the communications, services, or other carrier conduct complained of," *id.* at § 1.721(a)(6), supported by "relevant documentation or affidavit," *id.* at § 1.720(c). As AMC points out, the Commission's rules do provide for self-executing discovery, *see* 47 C.F.R. §§ 1.729 & 1.730, but the Commission, recognizing the relatively circumscribed role of discovery in a fact-pleading system, has placed limitations on the scope and methods of discovery in its formal complaint proceedings that do not exist in trials governed by the Federal Rules. *See Rules Governing Formal Complaints,* 3 F.C.C. R. at 1810 ¶¶ 38–40.

While the Commission certainly could have chosen to allow AMC discovery into Sprint's billing practices in cases of toll fraud, it did not abuse its discretion by denying AMC's motion to compel. The rules place the burden of pleading and documenting a violation of the Act on AMC. They do not require Sprint to prove that it has not violated the Act. We thus find no error in the Commission's ruling denying the motion to compel.

## IV.

■ AMC's remaining claims provide no basis for reversing the Commission. AMC did not present its charges that Sprint failed to warn it of the risks arising from toll fraud below, and we will not address a claim for the first time in a petition for review. *See* 47 U.S.C. § 405(a) (1988); *Action for Children's Television v. FCC,* 906 F.2d 752, 755 (D.C.Cir.1990). Nor are we persuaded that the Commission was obligated to determine whether Sprint's allegedly "anti-competitive" conduct caused TMS' bankruptcy. While AMC did raise this claim in its Motion for Final Order or Discovery Rulings, the allegation was not included in its complaint. The Commission did not abuse its discretion by declining to consider this untimely charge.

■ AMC's complaint did allege that it would be unjust for Sprint to profit at AMC's expense from the hackers' criminal activity. But because the Commission determined that Sprint's tariff was lawful and that it authorized Sprint to charge the tariff rates for unauthorized calls, AMC's attempt to draw an analogy between this case and the facts of *AT & T v. FCC,* 978 F.2d 727 (D.C.Cir.1992), *cert. denied* — U.S. —, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993), is unpersuasive. It was the Commission's decision in *AT & T* to undertake rulemaking proceedings without evaluating AT & T's complaint under existing law—what we referred to there as an "administrative law shell game"—that we found arbitrary. *See* 978 F.2d at 731–32. In the present case, the Commission did evaluate AMC's claim under existing law, thus fulfilling its "responsibilities in an adjudication properly before [it]." *Id.* at 732. Its subsequent decision to begin rulemaking proceedings regarding allocating the costs of toll fraud between carriers and their customers does not call its disposition of AMC's complaint into question.

■ AMC's final objection concerns the Commission's denial of its motion to impose sanctions on Sprint for allegedly willful violations of rules prohibiting "any misrepresentation or material omission" in written statements submitted to the Commission. The Commission found no evidence that Sprint's statements were knowingly false or misleading at the time Sprint made them. Recognizing that questions of misrepresentation are "peculiarly within the province of the Commission," *WEBR, Inc. v. FCC,* 420 F.2d 158, 164 (D.C.Cir.1969), we are satisfied that this finding is supported by substantial evidence.

For the foregoing reasons, we deny the petition for review.

*Denied.*