# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 4, 2020

Decided August 4, 2020
Reissued August 13, 2020

No. 18-1007

AT&T CORP.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

IOWA NETWORK SERVICES, INC., ET AL.,
INTERVENORS

———

Consolidated with 18-1257, 19-1013

———

On Petitions for Review of Orders of the
Federal Communications Commission

———

*James U. Troup* argued the cause for petitioner Iowa
Network Services, Inc. d/b/a Aureon Network Services. With
him on the briefs was *Tony S. Lee.*

*Benjamin H. Dickens Jr.*, *Mary J. Sisak*, and *Salvatore
Taillefer Jr.* were on the briefs for intervenor South Dakota

Network, LLC in support of petitioner Iowa Network Services, Inc. d/b/a Aureon Network Services.

*Joseph R. Guerra* argued the cause for petitioner AT&T Corp. With him on the briefs were *Michael J. Hunseder*, *Spencer D. Driscoll*, *Gary L. Phillips*, and *David L. Lawson*.

*Timothy J. Simeone* was on the briefs for intervenor Sprint Communications Company L.P. in support of petitioner AT&T Corp. *Christopher J. Wright* entered an appearance.

*William J. Scher*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Mary Helen Wimberly*, Attorneys, *Thomas M. Johnson, Jr.*, General Counsel, Federal Communications Commission, *Ashley S. Boizelle*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, entered an appearance.

*Joseph R. Guerra*, *Michael J. Hunseder*, *Spencer D. Driscoll*, *Gary L. Phillips*, *David L. Lawson*, and *Timothy J. Simeone* were on the brief for intervenors AT&T Corp. and Sprint Communications Company, L.P. in support of respondents. *Christopher J. Wright* entered an appearance.

*James U. Troup* and *Tony S. Lee* were on the brief for intervenor Iowa Network Services, Inc. d/b/a Aureon Network Services in support of respondents.

Before: TATEL, GRIFFITH, and KATSAS, *Circuit Judges*.

3

Opinion for the Court filed PER CURIAM.[*]

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KATSAS.

PER CURIAM: The Communications Act of 1934 restricts the rates that telecommunications carriers may charge for transmitting calls across their networks. AT&T contends that Aureon, an Iowa-based local carrier, for years charged it unlawful access rates. The Federal Communications Commission agreed with some of AT&T's claims but not others. On review, we consider three broad sets of issues: whether Aureon charged interstate and intrastate rates that violated certain transitional pricing rules, whether Aureon unlawfully engaged in or abetted a practice known as access stimulation, and whether Aureon's interstate tariff covers the service it provided.

I

The protagonists in this case are AT&T and Iowa Network Services, also known as Aureon. AT&T is a long-distance or interexchange carrier—one that transmits calls between the networks of local carriers. For example, when an AT&T subscriber in New York calls someone in Chicago, AT&T connects the call between local networks in both cities. Historically, the calling party would pay AT&T, which in turn would pay the appropriate local carriers. *See In re FCC 11-161*, 753 F.3d 1015, 1110–12 (10th Cir. 2014).

In most parts of the country, each local carrier directly connects its network to that of each long-distance carrier. But

---

[*] Judge Katsas wrote Parts I, II, III, IV.B, and IV.C of the per curiam opinion; Judge Tatel wrote Part IV.A.

in sparsely populated areas, this can be prohibitively expensive. In rural Iowa, local carriers solved the problem by forming Aureon as a joint venture. Aureon operates a set of switches connecting the networks of participating local carriers (known as subtending carriers) to those of long-distance carriers. So when an AT&T subscriber in New York calls someone in rural Iowa, AT&T connects the call from the local New York network to Aureon, which in turn connects it to the appropriate subtending carrier. *See In re Application of Iowa Network Access Division*, 3 FCC Rcd. 1468, 1468 (1988).

Aureon charges long-distance carriers for connecting calls from their networks to those of its subtending carriers. Different regulatory systems govern its charges for interstate calls and for intrastate calls involving different local networks within Iowa. For interstate calls, the Communications Act provides that all charges must be "just and reasonable," 47 U.S.C. § 201(b), and reflected in tariffs filed with the FCC, *id.* § 203(a). To implement these provisions, the FCC has established various regulations governing access charges for interstate calls. *See generally* 47 C.F.R. ch. 1, subch. B. Historically, the states have regulated access charges for intrastate calls. *See In re FCC 11-161*, 753 F.3d at 1111.

In recent years, the FCC has sought to transition away from inter-carrier access charges to a "bill-and-keep" approach. Recall the traditional arrangement for a long-distance call: the caller paid the long-distance carrier, which in turn paid access charges to local carriers at both ends. Under the new model, the local carriers will *bill* their own customers and *keep* that revenue. This will have two major effects. First, the cost of a call will be split between the calling party and the called party. Second, local carriers will earn revenue from their own subscribers, rather than from access fees charged to long-distance carriers. *See In re FCC 11-161*, 753 F.3d at 1113.

In 2011, the FCC promulgated regulations to start the transition to a bill-and-keep system for both interstate and intrastate calls. *See* Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support, 76 Fed. Reg. 81,562 (Dec. 28, 2011) (Transitional Pricing Rules). These regulations, which are called the "transitional access service pricing rules," progressively reduce the access charges that carriers may charge one another. *See* 47 C.F.R. §§ 51.901–51.919.

In the same rulemaking, the FCC also restricted a practice known as access stimulation. It involves enticing service providers that receive a high volume of calls, such as conference call services or adult hotlines, to locate in areas with high access charges, which are typically rural. The combination of high access charges and high call volumes generates significant revenue for the local carriers. To secure that revenue, local carriers sometimes pay service providers to lure them to the area. "It's a win-win for the [local carriers] and the conference call companies," but a loss for the long-distance carriers. *N. Valley Commc'ns, LLC v. FCC*, 717 F.3d 1017, 1018–19 (D.C. Cir. 2013).

Over the last decade, Aureon's rate for intrastate access charges has remained the same, but the company has twice changed its interstate rate. In 2012, Aureon filed a tariff with the FCC lowering its interstate rate from $0.00819 to $0.00623 per minute. In 2013, Aureon filed another tariff raising the rate to $0.00896 per minute. Although the rate changes involve tenths of a penny, they add up to millions of dollars across the billions of calling minutes that Aureon services.

AT&T has long believed that Aureon's access charges violate the transitional pricing rules. AT&T thus has refused

to pay Aureon's invoices in full since September 2013. In 2014, Aureon sued AT&T for the unpaid sums in the District of New Jersey. After AT&T made several counterclaims under the Communications Act, the district court referred the matter to the FCC under the doctrine of primary jurisdiction. *See Iowa Network Servs., Inc. v. AT&T Corp.*, No. 14-cv-03439, 2015 WL 5996301 (D.N.J. Oct. 14, 2015). That doctrine permits courts to stay cases involving "claims properly cognizable in court that contain some issue within the special competence of [the] agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). A primary jurisdiction referral stays proceedings "so as to give the parties reasonable opportunity to seek an administrative ruling." *Id.*

AT&T then filed a complaint against Aureon under 47 U.S.C. § 208, which permits administrative actions against telecommunications carriers. Four of AT&T's allegations are relevant here: First, Aureon's interstate and intrastate access charges violated the transitional pricing rules. Second, Aureon improperly engaged in access stimulation. Third, Aureon committed an unreasonable practice by agreeing with subtending carriers to connect calls involving access stimulation. Fourth, Aureon billed for service not covered by its 2013 interstate tariff.

In 2017, the FCC resolved the liability phase of the bifurcated proceeding. *AT&T Corp. v. Iowa Network Servs., Inc.*, 32 FCC Rcd. 9677 (2017). The agency agreed with AT&T's first argument that Aureon's access charges violated the transitional pricing rules. The Commission rejected AT&T's second and fourth arguments relating to access stimulation and the scope of the tariff. Finally, the FCC declined to consider the third argument—that Aureon committed an unreasonable practice in aiding access stimulation by its subtending carriers—because another section

208 complaint raised similar issues. After finding that Aureon's interstate rates violated the transitional pricing rules, the agency ordered Aureon to file a new interstate tariff. Aureon has complied with that order, which is not at issue here. Damages issues remain pending.

## II

AT&T and Aureon each seek review of portions of the FCC's liability determination. We have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). In a bifurcated proceeding under section 208, we have held that a party may seek immediate review of liability determinations. *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1103–06 (D.C. Cir. 2001).

The Administrative Procedure Act provides the familiar standard of review. As relevant here, we consider whether the FCC's liability order was arbitrary, capricious, or inconsistent with governing statutes and regulations. 5 U.S.C. § 706(2)(A).

## III

We begin with Aureon's petition, which contests the FCC's determination that Aureon violated the transitional access service pricing rules. The FCC rested its determination on 47 C.F.R. § 51.911, which it calls Rule 51.911. That rule, which applies to competitive local exchange carriers, has three subsections. Subsection (a) prohibits the carriers from increasing their intrastate rates above those in effect on December 29, 2011. Subsection (b) requires the carriers to lower their intrastate rates by specified amounts beginning on July 3, 2012. Subsection (c) prohibits the carriers from

charging higher rates than those charged by the competing incumbent local exchange carrier, effective July 1, 2013.

The FCC found that Aureon violated Rule 51.911 in two respects: it violated subsection (b) by not lowering its intrastate rate on or after July 3, 2012; and it violated subsection (a) by increasing its interstate rate in 2013. *AT&T Corp.*, 32 FCC Rcd. at 9689. In response, Aureon contends that Rule 51.911 does not apply to it at all, and so none of its charges violated that rule. More narrowly, Aureon contends that the cap in subsection (a) applies only to intrastate rates, and so its 2013 increase in interstate rates did not violate that subsection. We reject the broad argument but agree with the narrow one.

A

The transitional pricing rules cover Aureon's services. Those rules "apply to reciprocal compensation for telecommunications traffic exchanged between telecommunications providers that is interstate or intrastate exchange access, information access, or exchange services for such access, other than special access." 47 C.F.R. § 51.901(b). Aureon provides interstate and intrastate "exchange access … services." *See* J.A. 105 (Aureon's tariff describing "Switched Access Services"). And it does not claim to offer exempt "special access" service, which involves the use of lines dedicated to specific users. *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 453 (D.C. Cir. 2001).

The transitional pricing rules separately regulate three different categories of local carriers. Rule 51.907 applies to incumbent local exchange carriers operating under price-cap regulations; Rule 51.909 applies to incumbent local exchange carriers operating under rate-of-return regulations; and Rule 51.911 applies to competitive local exchange carriers. *See* 47 C.F.R. §§ 51.907, 51.909, 51.911. A "competitive local

exchange carrier" is "any local exchange carrier, as defined in § 51.5, that is not an incumbent local exchange carrier." *Id.* § 51.903. Aureon is a "local exchange carrier" because it "is engaged in the provision of telephone exchange service or exchange access." *Id.* § 51.5. And it is not an "incumbent" carrier because it neither provided telephone exchange service in 1996 nor succeeded a carrier that did. 47 U.S.C. § 251(h); *see* J.A. 349 (Aureon arguing that it "is not an ILEC"). Because Aureon is a "local exchange carrier … that is not an incumbent," the transitional pricing rules define it as a "competitive local exchange carrier," 47 C.F.R. § 51.903(a), and thus subject it to regulation under Rule 51.911.

In contending that Rule 51.911 does not apply, Aureon has little to say about the express regulatory definition of "competitive local exchange carriers." Instead, Aureon attempts to exploit a separate regulatory distinction between dominant and nondominant carriers. Aureon invokes a cross-reference in Rule 51.911(c), which caps the rates for competitive local exchange carriers at certain rates "charged by the competing incumbent local exchange carrier, in accordance with the same procedures specified in" 47 C.F.R. § 61.26. Rule 61.26 is limited to "nondominant carriers," *id.* § 61.18, which are carriers that have not been "found by the Commission to have market power," *id.* § 61.3(q), (z). Rule 61.26 does not apply to Aureon, which the FCC has found to have market power. *See In re Application of Iowa Network Access Division*, 3 FCC Rcd. 1468 at ¶ 10. But Rule 51.911 is not so limited. By its terms, it applies to all "competitive local exchange carriers," and Aureon clearly falls into that category. Moreover, neither Rule 51.911(a) nor Rule 51.911(b)—the specific provisions that the FCC found Aureon to have violated—contains the allegedly limiting reference to Rule 61.26. Even Rule 51.911(c) uses rates charged by "incumbent" local carriers to establish price caps that apply to all

"competitive" local carriers—a category that includes Aureon. And the incorporation into Rule 51.911(c) of "procedures" set forth elsewhere does nothing to restrict its applicability to all competitive carriers.[1]

Because Rule 51.911 applies to Aureon, we affirm the FCC's conclusion that Aureon violated subsection (b) by not lowering its intrastate rate as required.[2]

B

Aureon next contends that the 2013 increase of its interstate rate did not violate Rule 51.911(a). We agree. That rule provides that a competitive local exchange carrier may not "increase the rate for any originating or terminating intrastate switched access service above the rate for such service in effect on December 29, 2011." 47 C.F.R. § 51.911(a)(1), (2). In contrast, the parallel provisions for incumbent local exchange carriers cap "intrastate" and "interstate" rates as of December 29, 2011. *Id.* §§ 51.907(a), 51.909(a)(1), (2). Thus, Rule 51.911(a) does not cap the *interstate* rates of *competitive* carriers like Aureon.[3]

---

[1] The FCC reserved the question whether Aureon's 2013 tariff violated Rule 51.911(c). *AT&T Corp.*, 32 FCC Rcd. at 9689. We have explained why that provision applies to all competitive local exchange carriers, but we too reserve whether Aureon violated it.

[2] Aureon contends that applying the transitional pricing rules to it violates due process. But there is no failure of notice, and thus no due-process violation, in applying regulations as they are written. *See NetworkIP, LLC v. FCC*, 548 F.3d 116, 123 (D.C. Cir. 2008).

[3] The FCC briefly suggests that Rule 51.905 governs this analysis. It requires local exchange carriers to file tariffs consistent with "the default transitional rates specified by this subpart." 47

The FCC asks us to depart from the plain meaning of this regulation based on statements that it made in an explanatory document published shortly after the transitional pricing rules became effective. *See* Transitional Pricing Rules, 76 Fed. Reg. at 81,562. This document describes those rules as "capping all interstate switched access rates in effect as of" December 29, 2011. *See id.* at 81,630. But "[b]ecause the regulation itself is clear, we need not evaluate" either the regulatory "preamble" or any other document that "itself lacks the force and effect of law." *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018).[4]

The FCC contends that its explanatory statements, published in the Federal Register, should be treated as part of the binding regulation. It is mistaken. "Publication in the Federal Register does not suggest that the matter published was meant to be a regulation, since the APA requires general statements of policy to be published as well." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (Scalia, J.) (citing 5 U.S.C. § 552(a)(1)(D)). Instead, the "real dividing point" between the portions of a final rule with and without legal force is designation for "publication in the Code of Federal Regulations." *Id.* To be sure, we have reserved a possibility that statements in a preamble "may in

C.F.R. § 51.905(b). For competitive local exchange carriers such as Aureon, Rule 51.911 sets forth those rates.

[4] The parties reference the disputed statements as they appear in the FCC Record. *See* 26 FCC Rcd. 17,663, at ¶ 800–01. We reference the Federal Register because agencies "must publish substantive rules in the Federal Register to give them effect." *NRDC v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009); *see* 5 U.S.C. § 552(a)(1). As explained below, they must also publish them in the Code of Federal Regulations.

some unique cases constitute binding, final agency action susceptible to judicial review." *NRDC v. EPA, 5*59 F.3d 561, 565 (D.C. Cir. 2009) (citing *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1222–23 (D.C. Cir. 1996)). But "this is not the norm" because "[a]gency statements 'having general applicability and legal effect' are to be published in the Code of Federal Regulations." *Id.* (quoting 44 U.S.C. § 1510(a)). And where, as here, there is a discrepancy between the preamble and the Code, it is the codified provisions that control. For example, if a preamble purports to establish the regulatory treatment of "high wind events" but the regulations as published in the Code do not, then the preamble statement is a nullity. *See NRDC v. EPA*, 559 F.3d at 565. The same must be true for an explanatory document published not with the codified regulations, but shortly thereafter.

Alternatively, the FCC invokes a "note" to Rule 51.901 cross-referencing a "chart identifying steps in the transition." 47 C.F.R. § 51.901, note. The chart appears in the explanatory document mentioned above. It is a one-page, summary document that simply asserts—without citation—that the transitional pricing rules cap "interstate" switched access rates as of their effective date. *See* Transitional Pricing Rules, 76 Fed. Reg. at 81,631. The FCC tries to do too much with too little. For one thing, dropping a "note" referencing a summary "chart" would be a strange way to add to the rules being summarized. In any event, such a chart could hardly override the plain meaning of the rules themselves. Moreover, specific provisions qualify general ones. *See*, *e.g.*, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992). The fine print in Rule 51.911 is far more specific than the summary chart. And, as we have shown, it leaves no doubt that the 2011 price cap applies only to "intrastate" rates. We thus apply the transitional pricing rules as written.

For these reasons, we set aside the FCC's determination that Aureon violated Rule 51.911(a) by increasing its rate for interstate access charges in 2013.[5]

IV

We next turn to AT&T's petitions, which address the FCC's rulings on access stimulation, unreasonable practices, and the scope of Aureon's tariffs.

A

AT&T contends that Aureon's charges were unlawful because Aureon was engaged in access stimulation, i.e., enticing high call volumes to generate increased access charges. The FCC has made various efforts to curb that practice, which it considers "wasteful arbitrage." Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage, 84 Fed. Reg. 57,629, 57,630 (Oct. 28, 2019) (Updating Rule).

---

[5] Aureon raises various other arguments that we do not reach. Without elaboration, it suggests that the FCC lacks authority to limit intrastate rates and that the transitional pricing rules effect an unconstitutional taking. But "[a] litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (cleaned up). Aureon further invokes 47 U.S.C. § 204(a)(3), which provides that interstate tariffs filed by local exchange carriers "shall be deemed lawful" unless the FCC acts upon them within 15 days. Aureon contends that section 204(a)(3) prevents the award of damages for any violation of Rule 51.911(a) in this case. Having found no such violation, we need not reach this damages issue.

14

Rule 61.3(bbb) represents one of those efforts. Although the FCC has since amended the regulation to exclude carriers, like Aureon, that serve no end-users, *see id.* at 57,651, during the events at issue here, Rule 61.3(bbb) limited charges by any local exchange carrier "engaging in access stimulation," 47 C.F.R. § 61.3(bbb)(2) (2012). For our purposes, then, access stimulation involves (A) maintaining an "access revenue sharing agreement" and (B) servicing more than three times as many incoming calls as outgoing calls. *Id.* § 61.3(bbb)(1)(i). The parties agree Aureon met the second requirement. The question, then, is whether the FCC's conclusion that Aureon's contracts with its subtending carriers do not qualify as "access revenue sharing agreements" was reasonable. It was not.

As relevant here, section 61.3(bbb) defines an "access revenue sharing agreement" as an agreement between a local exchange carrier and another party that

> over the course of the agreement, would directly or indirectly result in a net payment to the other party (including affiliates) to the agreement, in which payment by the ... Competitive Local Exchange Carrier is based on the billing or collection of access charges from interexchange carriers or wireless carriers. When determining whether there is a net payment under this rule, all payments, discounts, credits, services, features, functions, and other items of value, regardless of form, provided by the ... Competitive Local Exchange Carrier to the other party to the agreement shall be taken into account.

*Id.* § 61.3(bbb)(1)(i). In short, the agreement must result in a "net payment" from the carrier to a counterparty, which must be "based on the billing or collection of access charges."

The FCC reasoned that Aureon's agreements were not covered because neither the agreements themselves, nor the "net payment[s]" to the subtending carriers, were "intended to facilitate access stimulation." *AT&T Corp.*, 32 FCC Rcd. at 9693. But the FCC never explained why Aureon's purported lack of intent mattered. After all, nothing in the definition of an "access revenue sharing agreement" suggests an intent requirement; to the contrary, the regulation provides that such agreements must "result in" a net payment, thus focusing on effects rather than intent. 47 C.F.R. § 61.3(bbb)(1)(i) (2012).

What's more, the FCC failed to acknowledge its own prior statement on what counts as an access revenue sharing agreement. In 2012, the FCC "clarif[ied]" that the "based on" language of section 61.3(bbb) is to be construed broadly, explaining that "any arrangement between a LEC and another party ... that results in the generation of switched access traffic to the LEC and provides for the net payment of consideration of any kind ... to the other party, ... is considered to be 'based upon the billing or collection of access charges.'" Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support, 77 Fed. Reg. 14,297, 14,301 (Mar. 9, 2012) (Clarification Rule). But in rejecting AT&T's access-stimulation claim, the FCC nowhere acknowledged this prior interpretation, a particularly glaring omission given that the agency's newfound intent requirement appears inconsistent with the clarification's expansive construction of section 61.3(bbb)'s regulatory language. Because "the process by which [the FCC] reache[d] [its final] result" was neither "logical [nor] rational," we vacate its decision. *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quoting *Tripoli Rocketry Association, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).

The dissent likewise finds the FCC's reasoning inadequate but would nevertheless uphold the agency's decision on the ground that the regulation left the FCC no discretion to reject AT&T's claim. *United Video, Inc. v. FCC*, 890 F.2d 1173, 1190 (D.C. Cir. 1989) (acknowledging that vacatur and remand "is not necessary" if "the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason"). As the dissent sees it, the regulatory language unambiguously excludes Aureon's contracts with its subtending carriers because there is no "arguable connection between Aureon's collection of access charges from long-distance carriers like AT&T and the 'net payment' that it provides to its subtending carriers." Dissent Op. at 4. According to the dissent, it would therefore be unreasonable to characterize the "net payment" from Aureon to its subtending carriers as "based on the billing or collection of access charges." 47 C.F.R. § 61.3(bbb)(1)(i) (2012). We respectfully disagree.

To be sure, the dissent offers one plausible reading of section 61.3(bbb), but it is hardly the only reasonable interpretation. As the FCC's 2012 clarification indicates, the definition of an "access revenue sharing agreement" could also cover an agreement that merely "results in the generation" of access-stimulation traffic and "provides for the net payment of consideration." Clarification Rule, 77 Fed. Reg. at 14,301. Under that reading, Aureon's agreements with its subtending carriers would be "based on the billing or collection of access charges" because the agreements "result[] in the generation" of access-stimulation traffic to the subtending carriers and "provide[] for the net payment of consideration" to those carriers. Contrary to the dissent, then, the language of section 61.3(bbb) does not unambiguously answer the question of whether Aureon's subtending agreements qualify as access revenue sharing agreements. We must therefore remand to the

FCC so that it may address the question in the first instance. *Cf. United Video, Inc.*, 890 F.2d at 1190.

B

The Communications Act provides that all practices in connection with interstate communications "shall be just and reasonable." 47 U.S.C. § 201(b). AT&T contends that Aureon violated this provision by agreeing to transmit calls reflecting access stimulation by subtending carriers. The FCC declined to reach this claim because a different administrative complaint filed by AT&T, against one of the subtending carriers, raised similar issues. AT&T argues that the FCC's refusal to adjudicate its claim was contrary to law. We agree.

AT&T lodged its complaint under section 208 of the Communications Act. That provision imposes a series of mandatory obligations to ensure the prompt and orderly disposition of complaints: The FCC must "investigate the matters complained of in such manner and by such means as it shall deem proper." 47 U.S.C. § 208(a). The FCC must "issue an order concluding such investigation" within five months. *Id.* § 208(b)(1). And the order "shall be" final and appealable. *Id.* § 208(b)(3).

In *AT&T Co. v. FCC*, 978 F.2d 727 (D.C. Cir. 1992), we held that this scheme requires the FCC to adjudicate section 208 complaints properly presented to it. There, the FCC declined to adjudicate a complaint that it thought "would be better considered in a rulemaking." *Id.* at 731. We held that this refusal was unlawful because section 208 imposes on the FCC, in its capacity "as an adjudicator of private rights," "an obligation to decide the complaint under the law currently applicable." *Id.* at 732. The same obligation governs here, despite the FCC's desire to forgo a decision and resolve related issues in another case.

In *MCI Worldcom Network Services, Inc. v. FCC*, 274 F.3d 542 (D.C. Cir. 2001), we recognized a limited exception to the FCC's duty to decide section 208 complaints. In that case, the FCC declined to entertain a claim that was "parallel" with and "duplicative" of claims in state administrative proceedings. *Id.* at 548. Moreover, the complainant sought "no relief from the FCC that the state public utility commissions [could not] grant." *Id.* Under those circumstances, we held that it was "reasonable for the FCC to defer to the states as a matter of comity." *Id.* Here, in contrast, there is no state proceeding to defer to. Moreover, AT&T is seeking damages from Aureon—relief that the FCC could not grant in a separate proceeding to which Aureon is not a party. And the question that AT&T seeks to raise, whether it was an unreasonable practice for Aureon to connect calls to subtending carriers engaged in access stimulation, goes well beyond the question whether any individual subtending carrier was so engaged.

We stress that our holding is narrow. Section 208 gives the FCC discretion over the "manner" and "means" of investigating a complaint, 47 U.S.C. § 208(a), which we have said allows the FCC to assign complaining parties the burden of proof, *see Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 785–87 (D.C. Cir. 2000). The agency thus retains traditional enforcement discretion in deciding whether or how to investigate AT&T's complaint. *See id.*; *Sprint Commc'ns Co. v. FCC*, 76 F.3d 1221, 1227–31 (D.C. Cir. 1996). But "as an adjudicator," the FCC must "decide" claims properly presented to it, *AT&T*, 978 F.2d at 732, at least absent some federalism-based justification for deferring to parallel state proceedings The FCC thus erred in refusing to adjudicate AT&T's unreasonable-practices claim.[6]

---

[6] Aureon contends that AT&T is collaterally estopped from arguing that connecting calls to access-stimulating carriers is an

19

C

Finally, AT&T challenges the FCC's determination that Aureon's existing interstate tariff covers traffic involving subtending carriers engaged in access stimulation. We defer to the FCC's interpretation of a tariff if it is "reasonable and based upon factors within the Commission's expertise." *Am. Message Ctrs. v. FCC*, 50 F.3d 35, 39 (D.C. Cir. 1995) (cleaned up). Here, the scope of Aureon's tariff presents highly technical questions that the FCC reasonably resolved.

The tariff provides rates for "switched access service," which it defines to include

> a two-point electrical communications path between a point of interconnection with the transmission facilities of an Exchange Telephone Company … and [Aureon's] central access tandem where the Customer's traffic is switched to originate or terminate its communications.

J.A. 196. The parties agree that Aureon provides "switched access service" by routing calls from long-distance carriers to the local exchange carriers that subtend its network.

AT&T highlights other tariff language repeatedly describing Aureon's service as "Centralized Equal Access Service." In AT&T's view, Aureon does not provide such a service when it transmits calls involving access-stimulating carriers. But in its own complaint, AT&T described "equal access service" as simply the local carrier providing all long-distance carriers with equivalent connections. The FCC

---

unreasonable practice. The FCC did not decide this question, which we leave open on remand.

adopted this definition. *See AT&T Corp.*, 32 FCC Rcd. at 9678. AT&T does not allege that Aureon failed to provide all long-distance carriers with equivalent connections to the networks of subtending carriers. More generally, AT&T suggests that the tariff distinguishes between calls reflecting access stimulation and other calls. But the FCC concluded that the tariff does not categorize calls in that way, and AT&T points to no tariff language to the contrary.

Alternatively, AT&T contends that equal access service involves only outgoing calls. But the tariff describes Aureon's service to occur when a customer's "traffic is switched to originate or terminate its communications." J.A. 196. Moreover, before the agency, AT&T stipulated that Aureon's authorized service covered both originating and terminating traffic. That makes good sense, as AT&T provides no reason why Aureon would seek to provide, or the FCC would approve, a service to enable the connection of calls flowing in one direction but not the other.

We affirm the FCC's determination that Aureon's interstate tariffs apply to traffic involving any local carriers engaged in access stimulation.

V

The petitions for review are granted in part and denied in part. We remand this case to the FCC for further proceedings consistent with this opinion.

*So ordered.*

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: I join the per curiam opinion except for Part IV.A, which remands for further consideration of whether Aureon engaged in access stimulation. In my view, the governing regulation unambiguously establishes that Aureon did not. Thus, even though the FCC's reasoning on this point was faulty, a remand is unnecessary.

As my colleagues explain, the question about access stimulation turns on whether Aureon provided its subtending carriers with a "net payment" that was "based on the billing or collection of access charges." 47 C.F.R. § 61.3(bbb)(1)(i)(A) (2012). I agree with my colleagues that this question does not turn on Aureon's intent, so we cannot affirm on the reasoning provided by the FCC below. *Ante* at 15. But unlike my colleagues, I would hold that the benefit provided by Aureon to its subtending carriers was not "based on the billing or collection of access charges." And because the FCC was bound to reach this conclusion as a matter of law, vacating its decision on this point is unnecessary.

Of course, we cannot affirm a discretionary agency decision based on reasoning not given by the agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 94 (1943). But "*Chenery* only applies to agency actions that involve policymaking or other acts of agency discretion." *Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 305 (D.C. Cir. 2015) (cleaned up). A *Chenery* remand "is not necessary" if "the agency has come to a conclusion to which it was bound to come as a matter of law." *United Video, Inc. v. FCC*, 890 F.2d 1173, 1190 (D.C. Cir. 1989). In that circumstance, "[t]o remand would be an idle and useless formality," and "*Chenery* does not require that we convert judicial review of agency action into a ping-pong game." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 544–45 (2008) (cleaned up). Finally,

while an ambiguous regulation permits the agency to choose from among textually reasonable interpretations based on policy considerations, an unambiguous regulation leaves it with no such interpretive discretion. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019).

In my view, the regulation on access stimulation unambiguously excludes Aureon's contracts with its subtending carriers. Aureon provides network capacity to those carriers at no charge, which is plainly a "net payment." But this payment is not "based on the billing or collection of access charges." To the contrary, Aureon provides the same network capacity to its subtending carriers regardless of the access charges that Aureon or those carriers ultimately collect. Indeed, Aureon's contracts within its subtending carriers have remained unchanged since 1989—well before the advent of access stimulation and fifteen years before even AT&T suggests that Aureon was engaged in it. Under these circumstances, characterizing the benefit that Aureon provides to subtending carriers as one "based on the billing or collection of access charges" would be unreasonable.

In concluding otherwise, my colleagues point to a different rule—*not* published in the Code of Federal Regulations—that purports to clarify 47 C.F.R. § 61.3(bbb)(1)(i)(A). *Ante* at 16. Here is the purported clarification in its entirety: "We clarify that any arrangement between a [local exchange carrier] and another party ... that results in the generation of switched access traffic to the LEC and provides for the net payment of consideration of any kind, whether fixed fee or otherwise, to the other party ... is considered to be 'based upon the billing or collection of access charges.'" Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost

3

Universal Service Support, 77 Fed. Reg. 14,297, 14,301 (Mar. 9, 2012) (Interpretive Rule).

In my judgment, this Interpretive Rule does not reasonably construe the governing regulation, at least as applied to inter-carrier connection agreements. By its terms, the access stimulation regulation does not apply unless a local exchange carrier forms an "access revenue sharing agreement" with another party that satisfies two distinct requirements: (1) the agreement must "result in a net payment" to the other party, and (2) this payment must be "based on the billing or collection of access charges" from long-distance carriers. 47 C.F.R. § 61.3(bbb)(1)(i)(A). By contrast, the Interpretive Rule requires only that the agreement "result in" more traffic for the local exchange carrier, which will be true for any connection agreement, and that the agreement "provide for" a net payment to the other party, which seems equivalent to requiring that the agreement "result in" a net payment to that party. On this understanding, the Interpretive Rule collapses the regulation's second requirement into its first, eliminating the need for a carrier's net payment to be "based on the billing or collection of access charges." We should not tolerate a construction that creates such obvious and inexplicable surplusage. *See*, *e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

The FCC understands its Interpretive Rule differently. The agency highlights the statement that an access revenue sharing agreement must "provid[e] for" a net payment from the local carrier to a third party. According to the FCC, this language means that the agreement must be intended to induce access stimulation, rather than that the agreement simply must result in a net payment to the third party. Even assuming that this reflects a permissible reading of the Interpretive Rule, which I doubt, an inducement requirement finds no basis in the access stimulation regulation. In sum, neither reading of the

Interpretive Rule, nested in a preamble to a different regulation, is consistent with the regulation. And because the access stimulation regulation "is clear, we need not evaluate these mixed signals from the preamble, which itself lacks the force and effect of law." *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018).

In fairness, I should note that the FCC's analysis was at least on the right track. For the agency did correctly recognize the fatal defect in AT&T's claim of access stimulation—the lack of even an arguable connection between Aureon's collection of access charges from long-distance carriers like AT&T and the "net payment" that it provides to its subtending carriers. But instead of conjuring up an intent-based inducement requirement, the agency simply should have concluded that the "net payment" from Aureon to its subtending carriers is not "based on the billing or collection of access charges." For that reason, I would affirm the FCC's conclusion that Aureon did not engage in access stimulation.